**James D. HABERMAN, Plaintiff,**

v.

**HUSTLER MAGAZINE, INC., et al., Defendants.**

**Civ. A. No. 84–151–W.**

United States District Court, D. Massachusetts.

Jan. 2, 1986.

Herbert L. Gatewood, Marullo & Barnes, Boston, Mass., for plaintiff.

William H. Lee, Lee & Hollander, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiff, James D. Haberman, initiated this action on January 19, 1984, seeking injunctive relief and damages for alleged copyright infringement in violation of 17 U.S.C. § 101 *et seq.* (1982) and for the alleged employment of unfair or deceptive acts or practices in violation of Mass.Gen. Laws ch. 93A (1984). The defendants are Hustler, Magazine, Inc. (*"Hustler"*), the publisher of *Hustler* magazine, and Flynt Distributing Co., Inc. ("FDC"). The case was tried to the court on the issue of liability.

For the reasons discussed below, the court has determined that defendants did not infringe plaintiff's copyright under federal law and that no violation of ch. 93A has been established.

## I. FINDINGS OF FACT

The court hereby finds the facts of this case as follows:

Plaintiff James D. Haberman is an artist and photographer who creates and photographs assemblies and sculpted works of art. Haberman also teaches photography at the New England School of Art and Design and has conducted workshops and given lectures on photography in the Boston area. Haberman is a resident of Massachusetts.

Defendants are Hustler Magazine, Inc., a California corporation located in Los Angeles, California which publishes *Hustler* magazine, and Flynt Distributing Co., a corporation responsible for the distribution of *Hustler* magazine. Both *Hustler* and FDC are wholly-owned subsidiaries of Larry Flynt Publications, Inc. ("LFP").

Haberman markets his photographs as fine art photographs and postcards. He also licenses publication rights in his works. Haberman promotes sales of his fine art photographs through his postcards and through exhibitions at galleries and museums.

The sale of Haberman's works in postcard form was begun in Fall, 1980. Haberman distributes postcards himself in the Boston area. Since March, 1981, other distribution has been handled primarily by an international distributor in New York, Fotofolio, Inc. Approximately ninety percent of Haberman's postcard sales are made through Fotofolio. In 1981, Haberman had eight cards for sale. He has introduced approximately five cards a year since then, and now has twenty-seven for sale through Fotofolio.

In Fall, 1981, Haberman created a work entitled "Cracking Eggs" by first making an "assembly" and then photographing it. "Cracking Eggs" was first published on March 8, 1982. Haberman created "The Feast" beginning on January 3, 1982, and completed it on April 28, 1982. He first created a sculpture and then photographed it. "The Feast" was first published on September 16, 1982.

"Cracking Eggs" is a surrealistic fine art photograph, the purpose of which is to surprise or shock the viewer by presenting a new perspective. (A copy of the "Cracking Eggs" postcard is Exhibit A hereto.) "The Feast" is a surrealistic fine art photograph intended as a satiric social commentary on the traditional family holiday gath-

ering. (A copy of "The Feast" postcard is Exhibit B hereto.)

Haberman's copyright in "Cracking Eggs" is registered with the United States Copyright Office. He is the owner of United States Certificate of Copyright Registration No. VA 123–379 for the photographic work "Cracking Eggs." The effective date of registration is February 22, 1983.

The copyright in "The Feast" is also registered with the United States Copyright Office. Haberman is the owner of United States Certificate of Copyright Registration No. VA–134–035 for the photographic work "The Feast." The effective date of registration is February 22, 1983.

*Hustler* is a commercial magazine directed at what it calls the "men's sophisticate" market. The issues of *Hustler* involved in this case contain sexually explicit photographs and text. *Hustler* is marketed nationwide, including in Massachusetts. It derives more than twenty percent (20%) of its gross revenues from interstate commerce outside of Massachusetts.

In its February, 1983 issue *Hustler* reproduced "Cracking Eggs" in the "Bits and Pieces" section of the magazine. The copy was approximately one-twentieth of a page in size, or one-fifth the size of the postcard. The reproduction included substantially the entire photograph, slightly cropped. The photograph was captioned " "It's No Yolk!" and was accompanied by eight lines of text. The text accompanying "Cracking Eggs" in the February, 1983 issue of *Hustler* reads:

> Frankly, we're confused by this postcard from Jim Haberman Cards (15 Cleveland Street, Arlington, MA 02174). But we're also intrigued by its visual impact. See if *you* can unscramble the picture's message. Our eyes are beat.

In its August, 1983 issue, *Hustler* reproduced "The Feast" in the "Bits and Pieces" section of the magazine. "The Feast" was reproduced in full, but reduced in size. The reproduction, occupying approximately one-sixth of a page, was accompanied by the caption "Family Portrait" and thirteen lines of text. The text accompanying "The Feast" in the August, 1983 issue of *Hustler* reads:

> We've heard of families that have too many mouths to feed ... but just mouths? This bizarre scene is the work of Jim Haberman, who not only photographed and sculptured these toothy creatures, but also sells the postcards (Jim Haberman Cards, 15 Cleveland St., Arlington, MA 02174). Alien beings may have one tradition in common with us here on Earth: brushing after every meal.

Hustler published a copyright notice beside "Cracking Eggs" in the February, 1983 issue of *Hustler*, stating "Copyright (c) Jim Haberman 1982." *Hustler* published a copyright notice beside the reproduction of "The Feast", in the August, 1983 issue, stating "Copyright (c) Jim Haberman."

*Hustler's* publication of "Cracking Eggs" and "The Feast" was without Haberman's consent. Haberman did not submit his works for publication in *Hustler*. *Hustler* has not paid Haberman for the use of his works.

Since February, 1984, Haberman has had a nonexclusive agreement with the Picture Cube, Inc., a stock photo agency in Boston, Mass., for the licensing of reproduction rights in his works. The Picture Cube has several dozen of his photographs in its files, including the "Silver Fantasy" series, which includes "Cracking Eggs" and "The Feast."

Haberman has sold 7,000 postcards of "Cracking Eggs" and 24,000 postcards of "The Feast". "The Feast" is Haberman's best-selling postcard. "Cracking Eggs" ranks sixth or seventh.

From August, 1982, when it was first published, until August 1983, Haberman sold 5,200 cards of "The Feast." In the six months following its reproduction in *Hustler*, Haberman sold 5,400 cards. Haberman sold 1,600 cards of "Cracking Eggs" from March, 1982, until February, 1983. In the five months following its publication

in *Hustler,* he sold 2,250 cards of "Cracking Eggs."

Haberman sold two copies of the fine art photograph "The Feast" in February and March of 1983 for $160.00 each. He has not sold any copies of the photograph "Cracking Eggs."

Haberman has also sold reproduction rights in "The Feast" on two occasions. In February, 1983, he sold rights for a one-time use as a bookcover for $150.00. "The Feast" was recently licensed to appear in the November, 1985 issue of *Darkroom Photography,* which purchased a one-time right for $180.00. Haberman has sold reproduction rights in other works on two occasions, for $225.00 and $160.00, respectively.

Haberman exhibited both "Cracking Eggs" and "The Feast" at the University of Wisconsin in 1982. "Cracking Eggs" was exhibited in the winter of 1983 at Framingham State College. "The Feast" was exhibited at Vision Gallery in the summer of 1984 and at Project Arts Gallery, Cambridge, and at a faculty show at the New England School of Art and Design in the fall of 1984. Haberman has exhibitions, including "Cracking Eggs" and "The Feast," scheduled for 1986 at the DeCordova Museum in Lincoln, Massachusetts, and in Canton, Massachusetts.

Haberman was awarded an Artist's Foundation Grant in 1979. He submitted works, including "Cracking Eggs" and "The Feast," to the Artist's Foundation contest in 1983 and has submitted works every year since then. In 1983, after publication of "Cracking Eggs" in *Hustler,* he received honorable mention in the contest.

The Picture Cube has sent out "Cracking Eggs" and "The Feast" on consignment to publishers six times each. Four of the consignments were sent out after the agency learned of the prior publication in *Hustler* of "Cracking Eggs" and "The Feast." In addition, clients have examined the photographs at the agency.

The Picture Cube has sold no reproduction rights in "Cracking Eggs" or "The Feast".

Haberman's total revenues from "Cracking Eggs" are $793.38. After deducting costs of development, the net loss from "Cracking Eggs" is $744.00. Haberman's total revenues from "The Feast," including sales of art photographs, postcards, and reproduction rights, are $2,835.00. After deducting costs of development, the net loss from "The Feast" is $2,282.

Haberman did not suffer any actual damages from lost sales of postcards, photographs or reproduction rights as a result of the reproduction of "Cracking Eggs" and "The Feast" in *Hustler.* There were no instances in which Haberman's ability to exploit those works commercially had been damaged as a result of their reproduction in *Hustler.*

Haberman did not incur any monetary loss or damage to property as a result of the reproduction of "Cracking Eggs" and "The Feast" in *Hustler.*

There were no instances in which knowledge of the publication in *Hustler* on the part of customers, galleries or foundations affected the reception or sale of "Cracking Eggs" or "The Feast". Haberman's works were accepted for exhibition by the Project Arts Center in September-October, 1984, and by the DeCordova Museum for February-April, 1986, despite knowledge of the publication of "Cracking Eggs" and "The Feast" in *Hustler.* "The Feast" was accepted for publication in the November, 1985 issue of *Darkroom Photography* despite information from Haberman as to the prior publication in *Hustler.*

The Picture Cube has not disclosed to its clients that "Cracking Eggs" and "The Feast" were published in *Hustler,* although it would do so if someone expressed interest in either of them. There is no evidence to indicate that "Cracking Eggs" and "The Feast" have not been selected by clients of the Picture Cube because of their publication in *Hustler.*

There were no instances in which the reproduction of "Cracking Eggs" or "The Feast" in *Hustler* had cast doubt on Haberman's ownership of the copyright in those works.

Over 1,725,000 copies of the February, 1983 issue of *Hustler* were printed, of which approximately 980,000 were sold. Over 1,725,000 copies of the August, 1983 issue of *Hustler* were printed, of which approximately 977,000 were sold.

The on-sale date for the February, 1983 issue of *Hustler* was December 21, 1982. The off-sale date for the February, 1983 issue of *Hustler* was January 24, 1983. The on-sale date for the August, 1983 issue of *Hustler* was June 28, 1983. The off-sale date for the August, 1983 issue of *Hustler* was July 27, 1983. The on-sale date, although a target date, is a firm date.

"Bits and Pieces" is a regular feature section of *Hustler* magazine consisting of brief items concerned with events, personalities, products and services intended to be of interest to *Hustler's* readers.

The purpose of the "Bits and Pieces" section of the February and August, 1983 issues of *Hustler* was to present items which *Hustler* considered interesting, humorous or outrageous, to entertain its readers, and to comment, often in what *Hustler* regarded as a humorous fashion, on unique events, products and services.

*Hustler's* purpose in reproducing "Cracking Eggs" and "The Feast" was to entertain its readers and to comment on the cards.

The editor of "Bits and Pieces" for the February, 1983 and August, 1983 issues of *Hustler* purchased the postcards from which reproductions of "Cracking Eggs" and "The Feast" were made.

Some of the items printed in "Bits and Pieces" in the February and August 1983 issues of *Hustler* were received from contributors.

The February, 1983 issue of *Hustler* magazine included a "Contributor's Box" which contained the statement:

HUSTLER pays $150 for *Bits & Pieces* items. Larry Flynt Publications retains all rights to material accepted for publication, but we'll return original art on request (enclose SASE). For February, $150 goes to A.J. Grimaldi and Raymond Tillman.

The August, 1983 issue of *Hustler* magazine included a "Contributor's Box" which contained the statement:

HUSTLER pays $150 for *Bits & Pieces* items (or $50 if two or more submissions are used in one *B & P* item). Larry Flynt Publications retains all rights to any material submitted, but we'll return any rejected material and original artwork (not including photos) on request if an SASE is enclosed. For August, $150 goes to L. Ayers, J. Dawson, R. Julien and D. Sandler.

*Hustler* would not have obtained any advantage from intentionally implying or misleading its readers to believe that Haberman personally contributed the postcards "Cracking Eggs" and "The Feast". Nor would Hustler have had any other reason to do so.

Haberman informed Hustler through his attorney by letter dated May 20, 1983, of the possibility of legal action for alleged infringement of copyright, invasion of privacy, defamation, and the use of unfair or deceptive acts or practices regarding *Hustler's* use of "Cracking Eggs" in its February, 1983 issue. The letter was received by Hustler on May 25, 1983.

The February, 1983 and August, 1983 issues of *Hustler* were printed by Wisconsin Cuneo Press, Inc. in Milwaukee, Wisconsin. The magazine was printed in forms. The printing of form three of the August, 1983 issue, which contained all but the first two pages of "Bits and Pieces" and included the reproduction of "The Feast," was completed by 7:00 A.M., Milwaukee time, on May 25, 1983. Shipping of completed copies of the August, 1983 issue was begun on May 26, 1983 and completed on June 10, 1983.

On May 25, 1983, it was not feasible, as a practical matter, for *Hustler* to withdraw

the reproduction of "The Feast" and the accompanying text from the August, 1983 issue.

On May 25, 1983, there were several cases involving alleged violations of the copyright law pending against *Hustler.* An earlier case, also involving a claim of copyright infringement, had been completed by dismissal of the copyright claim. One of the cases did not involve the defense of fair use. Of the other pending cases, none had been tried or otherwise resolved at the time *Hustler* received Haberman's letter of May 20, 1983.

## II. CONCLUSIONS OF LAW

For the reasons set forth below, the court concludes that Hustler's publication of "Cracking Eggs" and "The Feast" neither violated the federal copyright law nor the Massachusetts statute prohibiting unfair and deceptive trade practices.

1. *Hustler's Use of Haberman's Copyrighted Materials is Protected under the Doctrine of Fair Use.*

Section 106 of the Copyright Act of 1976 confers exclusive rights on the copyright owner, including rights to reproduce and distribute the copyrighted work. 17 U.S.C. § 106. The rights of the copyright owner are, however, subject to specific statutory limitations. One of these is the privilege of others to make "fair use" of the copyrighted work. 17 U.S.C. § 107. In the present case, *Hustler* reproduced and distributed copies of Haberman's original photographs "Cracking Eggs" and "The Feast" in the February, 1983 and August, 1983 issues of *Hustler* magazine, respectively. *Hustler* contends, however, that its use of these works was a "fair" one within the meaning of 17 U.S.C. § 107. The court agrees.

Fair use has been defined as " 'a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent.' " *Harper & Row Publishers, Inc. v. Nation Enterprises,* — U.S. —, —, 105 S.Ct. 2218, 2225, 85 L.Ed.2d 588 (1985) (quoting H. Ball, *Law of Copyright and Literary*

*Property,* 260 (1944)); *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). The doctrine affords a means of accommodating the exclusive rights of the copyright owner and "the public's interest in the dissemination of information affecting areas of universal concern...." *Wainwright Securities, Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 94 (2d Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978).

The statutory provision for the defense of fair use codifies prior judicial doctrine. *Harper & Row,* 105 S.Ct. at 2225. Fair use presents a mixed question of fact and law which must be determined by consideration of the facts of each particular case evaluated in terms of the specific, nonexclusive criteria set out by statute. Section 107 provides, in part:

Notwithstanding the provisions of section 106 [17 U.S.C. § 106], the fair use of a copyrighted work, including such use by reproduction ... for purposes such as criticism [and] comment, ... is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. As elaborated below, the court finds that *Hustler* has established by a preponderance of the evidence that it made fair use of Haberman's copyrighted work largely because *Hustler* demonstrated that its publication of "Cracking Eggs" and "The Feast" did not materially impair the marketability or value of either work.

This issue, presented by the fourth § 107 factor, is "undoubtedly the single most important element of fair use." *Harper & Row*, 105 S.Ct. at 2234.

Before addressing the four factors established by § 107 and the equity of allowing the fair use defense to prevail in this case, it is appropriate to state explicitly what the court has not considered in deciding this matter. The court has not considered the merit of Haberman's art. Nor has the court considered either the merit of *Hustler* magazine generally or the merit of the statements it made concerning Haberman's work particularly.

The court views this case as presenting a clash of First Amendment values. Copyright protection is "the engine of free expression" for it "supplies the economic incentive to create and disseminate ideas." *Harper & Row*, 105 S.Ct. at 2230. Thus, the copyright laws promote the individual's interest in expressing himself fully, freely and creatively, as well as society's interest in obtaining the benefit of such expression.

It is axiomatic, however, that the First Amendment also protects freedom of the press. The right of the press to publish its views is another means of promoting the individual's interest in self-expression and society's interest in benefitting from that expression.

The First Amendment generally applies without regard to "the truth, popularity, or social utility of the ideas and beliefs which are offered." *NAACP v. Button*, 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963); *see also Hannegan v. Esquire, Inc.*, 327 U.S. 146, 156–158, 66 S.Ct. 456, 461–462, 90 L.Ed. 586 (1946). It is important that this principle be recognized in this case and applied equally to each party.

■ Thus, the court has deemed irrelevant the degree to which Haberman's works appeal to it, to art critics, or to the public. "[W]hat is good art ... varies with individuals as it does from one generation to another." *Hannegan*, 327 U.S. at 157, 66 S.Ct. at 461. A requirement that in order to be legally protected "art conform to some norm prescribed by an official

smacks of an ideology foreign to our system." *Id.* at 158, 66 S.Ct. at 462. It would be especially inappropriate if that official were a judge. As Justice Holmes recognized in refusing to deny copyright protection to a circus poster because it purportedly was not a pictorial illustration within the meaning of the Copyright Act,

> It would be a dangerous undertaking for persons trained only in the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits. At one extreme some works of genius would be sure to miss appreciation.... At the other end, copyright would be denied to pictures which appealed to a public less educated than the judge.

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251–52, 23 S.Ct. 298, 300–01, 47 L.Ed. 460 (1903); *see also Mitchell Brothers Film Group v. Cinema Adult Theater*, 604 F.2d 852, 855 (5th Cir.1979), *cert. denied sub nom. Bora v. Mitchell Brothers Film Group*, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980). Thus, it has been wisely determined by Congress and the courts that the values of the First Amendment are best served by extending copyright protection to all art, without regard to official perceptions of its merit.

The corollary of this is the conclusion that it would also be improper for the court to attempt to evaluate the merit of *Hustler* magazine generally or the merit of its statements concerning Haberman's art particularly. Haberman testified that he found *Hustler's* statements to be "superficial," but that he would not have objected if the same use of his pictures and same commentary had been made by a newspaper or fine art magazine. Thus, he in effect contends that the quality of the comment and nature of the publication should be considered by the court in deciding the question of fair use. There are cases which suggest this would be permissible and appropriate. *See e.g., Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130, 146 (S.D.N.Y.1968) (in finding fair use the court stated that defendant "did serious

work on the subject [of President Kennedy's assasination] and has a theory entitled to public consideration"); *Meeropol v. Nizer,* 361 F.Supp. 1063, 1068 (S.D.N.Y.1973) (in finding a likelihood of establishing fair use the court stated, "defendants are likely to prove that their book is a serious, full and readable account of what was a trial of great historical interest"); *Rosemont,* 366 F.2d at 304. This court respectfully disagrees.

Courts are neither constituted nor equipped to evaluate the merit of protected speech. As Holmes wrote, "Judges are apt to be naif, simple-minded men ..." *Occasional Speeches of Justice Oliver Wendall Holmes* 172 (Howe ed. 1962). As he also noted in a different but analogous context, "the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment" on whether they are reasonable. *Lochner v. New York,* 198 U.S. 45, 76, 25 S.Ct. 539, 551, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). In the copyright context, there is an obvious danger that any judicial effort to evaluate the merit of a publication or particular commentary will result in equating the agreeable with the valuable and the unpopular with the unimportant. This, however, would tend to deny the protection of the First Amendment to the journals and journalists needing it most. For as a friend of Elijah Lovejoy, the Abolitionist printer killed in the riots his publications provoked, said at the time, "We are more especially called upon to maintain the principles of free discussion in the case of unpopular sentiments or persons, as in no other case will any effort to maintain them be needed." Beecher, *Alton Riots* (Alton, Ill., 1838).

Thus, neither the perceived merit of Haberman's art nor *Hustler* and its commentary concerning that art has been considered by the court.

With regard to the four statutory factors and other relevant matters, the court finds as follows.

### A. *Purpose and Character of the Use*

■ The court has, as required by the statute, considered the purpose and character of Hustler's use of Haberman's materials. In this regard, it has long been recognized that copyrighted works may be utilized in the course of commentary or criticism, but if a copyrighted work is published "with a view, not to criticize, but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy." *Folsom v. Marsh,* 9 F.Cas. 342, 344–45 (No. 4, 901) (CC Mass.1841) (quoted in *Harper & Row,* 105 S.Ct. at 2225).

■ With regard to the purpose of the uses in question, Haberman contends that *Hustler* intended to expropriate the entertainment value of his copyrighted creations. *Hustler* claims it wished to comment on them and their reproduction was essential to doing so. The court concludes that *Hustler* sought both to entertain its readers with Haberman's works and to comment on them. These facts tend to neutralize each other in the fair use analysis.

■ In considering the character of the use in question, the court has recognized that *Hustler* magazine is a publication which seeks to earn a profit. The commercial use of copyrighted material generally weighs against a finding of fair use. "[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright...." *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574, *reh'g denied,* 465 U.S. 1112, 104 S.Ct. 1619, 80 L.Ed.2d 148 (1984). The fact that *Hustler* magazine is offered for sale, however, does not dictate a finding that the reproduction of Haberman's works was a commercial use. Commentary "is not put to a commercial use simply because the publication is sold rather than given to the public." *Pillsbury Co. v. Milky Way Productions, Inc.,* 215 U.S. P.Q. 124, 131 (N.D.Ga.1981). The critical issue "is not whether the sole motive of the

use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 105 S.Ct. at 2231–32.

In this instance, *Hustler* did not exploit the value of Haberman's works in order to sell copies of its magazine. The works were reproduced as items inside the magazine in a regular feature section. In contrast to cases in which fair use was not established, their inclusion was not advertised on the cover, nor made evident to prospective purchaser of *Hustler*. Compare *Rubin v. Boston Magazine Co.*, 645 F.2d 80, 82 (1st Cir.1981). It does not appear that that reproduction of Haberman's postcards was intended to increase sales of the magazine and, thus, in this fashion, improperly capitalize on Haberman's work. *Pillsbury Co.*, 215 U.S.P.Q. at 131. Therefore, while *Hustler* is published for profit and use of Haberman's works contributed to its entertainment value, the manner of use in this case is not a strong factor militating against a finding of fair use.

■ The court has also considered whether Hustler's use of "Cracking Eggs" and "The Feast" had the purpose or effect of supplanting Haberman's use of them and concludes it did not. Misappropriation for a directly competing use would likely be incompatible with fair use. *Harper & Row*, 105 S.Ct. at 2232 (defendant's conduct was for the intended purpose of supplanting a competitor's right to be the first to publish President Ford's memoirs); *Marcus v. Rowley*, 695 F.2d 1171, 1175 (9th Cir.1983) ("a finding that the alleged infringers copied the material to use it for the same intrinsic purpose for which the copyright owner intended it to be used is strong indica of no fair use").

This case, however, does not involve directly competing uses. Haberman markets his works as fine arts photographs and postcards. The *Hustler* reproductions were not of comparable size or quality. They would not serve as suitable substitutes for someone who wished to collect the art, in either photographic or postcard form, or share it with another by sending the postcard.

■ Also relevant to the "character" of the use is "the propriety of the defendant's conduct." *Harper & Row*, 105 S.Ct. at 2232 (quoting 3 M. Nimmer, *Nimmer on Copyright* § 13.05[A], at 13–72). This factor tends to support a finding of fair use in this case. Copies of the postcards were placed on sale by Haberman and fairly acquired by *Hustler*. Compare *Harper & Row* (knowing exploitation of purloined manuscript). In addition, *Hustler* credited Haberman with the copyright of the reproduced works and informed readers of how they could buy them from him. Thus, there was no attempt to palm off Haberman's work as its own. *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1176 (5th Cir.1980). Except to the degree, previously described, to which Hustler sought to entertain its readers with Haberman's works as well as with its commentary on them, there is no evidence of bad faith by *Hustler*.

### B. *Nature of the Copyrighted Work*

■ With regard to the nature of the works in question, it is not disputed that "Cracking Eggs" and "The Feast" are fine art photographs of a surrealistic character. "The Feast" was intended as social commentary on the traditional family gathering. "Cracking Eggs" was intended to surprise the viewer by presenting a different perspective. The works are creative, imaginative, and original. They represent a substantial investment of time and labor in anticipation of a financial return, among other things. The law generally recognizes a greater need to disseminate factual works than works of fantasy such as those at issue here. *Harper & Row*, 105 S.Ct. at 2232. The pronounced creativity and investment of time involved in the works in this case weigh against a finding of fair use. *MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir.1981).

However, prior to *Hustler's* publication, the copyrighted works had been made public by Haberman. The scope of fair use is broadest with respect to publicly released works. *Harper & Row,* 105 S.Ct. at 2232. The artist's right to control the first public appearance of his work, which is an important one, is not implicated in this case.

Therefore, consideration of the nature of the works involved weighs against a finding of fair use, although not as heavily as it would if they had not been previously made public by Haberman.

### C. *The Amount and Substantiality of the Use*

Hustler reproduced Haberman's photographs substantially in full, although "Cracking Eggs" was slightly cropped. The copies were reduced in size. In the particular circumstances of this case, however, this does not itself tend to weigh against a finding of fair use. The works in question are graphic and unusual. For the purpose of criticism and commentary, they could not be adequately described by words. As indicated earlier, it has long been recognized that a commentator may fairly reproduce as much of the original, copyrighted work as is necessary to his proper purpose. *Folsom,* 9 F.Cas. 344–45. Thus, to the extent that *Hustler's* purpose was to comment on Haberman's works, full reproduction of them was appropriate.[1]

### D. *Effect of the Use on Potential Market*

The court has also considered the effect of Hustler's publication of "Cracking Eggs" and "The Feast" upon the potential market for or value of each work. As indicated earlier, this is "undoubtedly the single most important element of fair use." *Harper & Row,* 105 S.Ct. at 2234 (citing 3 *Nimmer* § 13–05[A], at 13–76, and cases cited therein.) It is on this point that plain-

tiff's case fatally falters, for *Hustler* has demonstrated, largely through cross-examination of plaintiff's witnesses, that its publications of "Cracking Eggs" and "The Feast" did not "materially impair the marketability" of either work. *Id.*

Haberman does not contend that *Hustler's* publication of his works caused him actual harm. In determining the effect of publication on the market, however, "[a]ctual present harm need not be shown ..." *Sony Corp.,* 464 U.S. at 451, 104 S.Ct. at 793. Thus, the court has focused on whether "*some* meaningful likelihood of future harm exists" and, treating Hustler's publications as commercial uses, has presumed that likelihood. *Id.* Nevertheless, the preponderance of the evidence persuades the court that no meaningful likelihood of future harm to the value or market for "Cracking Eggs" or "The Feast" was caused by *Hustler's* publication of them.

The market for the works in question includes sales of postcards, sales of photographs, licensing of reproduction rights, and museum or gallery displays. The experience to date in each of these areas indicates that it is unlikely that any harm to the market for either work has or will occur as a result of *Hustler's* actions. Rather, the evidence demonstrates the following.

Haberman's sales of postcards of "Cracking Eggs" and "The Feast" each increased after their publication in *Hustler.*

Haberman did not sell any photographs of "Cracking Eggs" before or after *Hustler's* reproduction of it. He did sell two photographs of "The Feast" prior to *Hustler's* use of it. However, a reasonable probability of a causal connection between the disputed use and lost revenue is required for the court to presume that damage has been caused by the alleged in-

---

**1.** The court agrees with the commentator who noted, "the fair use privilege to quote portions of copyrighted works for purposes of criticism or review is compatible with the protection of economic incentives, since the resulting work performs a different function than the original and is not a market substitute." R. Denicola, "Copyright and Free Speech: Constitutional Limitations on the Protection of Expression," 67 California Law Review 283, 301–02 (1979). *See generally* 3 M. Nimmer, *Nimmer on Copyright* § 13.05 (1978).

fringement. *Harper & Row*, 105 S.Ct. at 2234. Neither Haberman nor his sales representative has disclosed the prior publication of "The Feast" in *Hustler* to prospective purchasers of the photograph. There is no other evidence from which to infer that possible purchasers knew of the *Hustler* publications. Thus, the evidence does not indicate a reasonable probability of a causal connection between publication and the lack of subsequent sales of the photographs of either work.

With regard to publication rights, Haberman recently licensed "The Feast" to *Darkroom Photography* for use in its November, 1985 issue, notwithstanding disclosure to the magazine of its prior publication in *Hustler*. This suggests that *Hustler*'s use of "The Feast" did not destroy the potential market for its publication; nor does the evidence suggest this market was diminished. Once again, with regard to "Cracking Eggs," there is no evidence from which to infer that any lack of interest in publishing the photograph has been caused by its use by *Hustler*. There has been no commercial interest in it before or after its use by *Hustler*.

In addition, defendant demonstrated that museums and galleries have continued to accept the works in question for exhibition despite their knowledge of the *Hustler* publications. There is no evidence indicating that the market for exhibition of the works, and the opportunity to sell the works which exhibition affords, have been injured by *Hustler's* actions.

Haberman contends that the market for "Cracking Eggs" and "The Feast" also includes potential publication in textbooks and that it is here that the most serious harm to their value has been suffered by publication in *Hustler* Magazine, which he asserts is a journal inappropriate for children and undesirable to many adults. This claim is based primarily on the expert opinion testimony of Haberman's sales representative. It is initially appealing. Exami-

nation indicates, however, that while the expert was sincere, she was not convincing because her opinion was based on assumptions the court finds not to be proven.

The evidence does not indicate that there would have been a reasonable probability of sales of "Cracking Eggs" or "The Feast" for use in textbooks if they had not been published in *Hustler*. Rather, it shows that there are thousands of fine art photographs available for use in textbooks and only a small fraction of them ever achieve such use. Haberman's surrealistic works are strikingly unusual, further limiting their potential in the textbook market. Haberman's representative has sent the photographs of "Cracking Eggs" and "The Feasts" to prospective purchasers, including textbook publishers, six times each. She has not disclosed their prior publication in *Hustler*. Yet there has been no interest expressed in either piece. Thus, the evidence does not establish that there is a reasonable probability of a textbook market for the disputed photographs or that any such market has been materially impaired by the alleged infringement.[2]

Moreover, the court finds that even assuming an injured textbook market for "Cracking Eggs" and "The Feast", such injury would be *de minimis*. Haberman's expert testified that the average sale price for first publication rights for a textbook cover was $450 in 1984; other textbook uses paid less. Losses in this range for each work would not materially injure their total potential commercial value as it was characterized by and on behalf of Haberman. *See Pillsbury Co.*, 215 U.S.P.Q. at 130–31.

Finally, with regard to the fourth factor, the court has considered whether "if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" *Harper & Row*, 105 S.Ct. at 2234–35, (quoting *Sony Corp.*, 464 U.S. at 451, 104 S.Ct. at 793). The court concludes it would not.

---

**2.** In reaching this conclusion the court has presumed that if interest were expressed by a publisher of a pre-college text, it would be diminished, if not destroyed, by disclosure of *Hustler's* prior use. This, however, may not be the case concerning a college text.

Haberman testified that he would not object if what he regarded as more reputable journals or newspapers engaged in *Hustler*'s conduct. The court believes that even superficial commentary on the fully reproduced works in most journals would enhance rather than diminish their value. In addition, since publication in *Hustler* did not materially affect the marketability of "Cracking Eggs" and "The Feast", the court does not believe that comparable use in other magazines of *Hustler*'s genre would do so.

For these reasons, the vital fourth factor supports a finding of fair use.

### E. *Equitable Considerations*

■ The four statutory factors are not the only issues to be considered in determining if a use is fair. *Harper & Row*, 105 S.Ct. at 2225. Fair use presupposes good faith. *Id.* at 2220–21. Thus, the court has considered other evidence bearing on whether a finding of fair use would be equitable in this case.

■ The court again notes that the pieces reproduced were fairly acquired by *Hustler* and no effort was made to palm them off as anything other than Haberman's creations. As a practical matter, it was too late to remove "The Feast" from the August, 1983 issue when *Hustler* received notice of Haberman's objection to the earlier use of "Cracking Eggs;" thus, the repeated nature of the now questioned conduct is not an aggravating factor. Similarly, during the relevant period *Hustler* had not yet lost any case involving comparable issues, including *Brewer v. Hustler*

*Magazine, Inc.*, 749 F.2d 527 (9th Cir.1984) —a case which should now inform *Hustler* that its use of copyrighted works in its "Bits & Pieces" section involves risky business, despite the ruling favorable to it in this case.[3] Thus, the court concludes that equitable considerations do not overcome the finding of fair use indicated by analysis of the four statutory factors.

For the foregoing reasons, Haberman's claims of copyright infringement are denied.[4]

### 2. *Plaintiff has not Sustained His Cause of Action Under Mass.Gen.Laws ch. 93A, § 2.*

Mass.Gen.Laws ch. 93A makes unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass.Gen.Laws ch. 93A, § 2(a) (1984). Section 11 creates a private cause of action for any person who suffers a loss as a result of the employment by another person engaged in trade or commerce of an unfair or deceptive act or practice. Mass.Gen.Laws ch. 93A, § 11. As a prerequisite to suit under § 11, a plaintiff must have suffered a "loss of money or property, real or personal." *Id.* The Massachusetts Supreme Judicial Court, interpreting identical statutory language in former § 9 of chapter 93A, has held, "that in § 9(1) 'money' means money, not time, and that 'property' means the kind of property that is purchased or leased, not such intangibles as a right to a sense of security, to peace of mind, or to personal liberty." *Baldassari v. Public Finance Trust*, 369 Mass. 33, 45, 337 N.E.2d 701 (1975).[5]

---

**3.** This case and *Brewer* involve similar issues and similar facts, but reach different results. They are, however, reconcilable. In *Brewer*, the Ninth Circuit decided that on the evidence presented, the jury could have reasonably concluded that plaintiff's copyright was infringed. *Brewer*, 749 F.2d at 529. It did not hold such a finding was required. Of more importance, "'each case raising the question [of fair use] must be decided on its own facts.'" *Harper & Row*, 105 S.Ct. at 2231 (quoting H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 66, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5680). In this case, the evidence concerning the impact of publication on potential markets and values

was of decisive importance. Such evidence is unique to every case.

**4.** This conclusion applies equally to defendant FDC. Plaintiff properly did not contend that FDC's distributional activities were added evidence of the alleged copyright infringement.

**5.** After the decision in *Baldassari*, ch. 93A, § 9, which relates to consumer disputes, was amended to enlarge consumer causes of action by requiring only "injury" rather than a "loss of money or property". *Leardi v. Brown*, 394 Mass. 151, 474 N.E.2d 1094 (1985). Chapter

Haberman contends that *Hustler*'s publication of his works constitutes misrepresentation in violation of the chapter 93A in that it is made to appear from the context of the reproduction that Haberman himself submitted the work to *Hustler* and thereby authorized its publication in the magazine. Haberman also claims that the publication casts doubt on his ownership of the copyright in his works and is misleading as to the availability of the postcards.

■■■■■ Haberman admitted at trial, however, that he did not incur any loss of money or property, real or personal, as a result of Hustler's reproduction of "Cracking Eggs" and "The Feast." Haberman also stated that he had not suffered any actual damages in any form as a result of the publication of "Cracking Eggs," and "The Feast" in *Hustler*. The evidence presented in support of Haberman's claim of copyright infringement did not establish that any present loss of value to the works had been sustained.[6] Under these circumstances, the requirement of demonstrating loss to money or property under § 11 has not been met. Accordingly, plaintiff has not proven a violation of chapter 93A.

■■■ In addition, prior to July 22, 1983, a limited exemption from chapter 93A was in effect for businesses engaged in interstate commerce. *See* 1983 Mass.Acts ch. 242. Former § 3(1) of the statute provided:

(1) Nothing in this chapter shall apply to

. . . . .

(b) trade or commerce of any person of whose gross revenue at least twenty per cent is derived from transactions in interstate commerce, excepting however transactions and actions which (i) occur primarily and substantially within the Commonwealth, and (ii) as to which the Federal Trade Commission or its designated representative has failed to assert in writing within fourteen days of notice to it ˙and to said person by the attorney general its objection to action proposed by him and set forth in said notice. . . .

Mass.Gen.Laws ch. 93A, § 3 (amended by 1983 Mass.Acts ch. 242). The Massachusetts Appeals Court has recently determined that since the repealing statute created and enlarged obligations under chapter 93A it should not be given retroactive effect. *Goldstein Oil Co. v. C.K. Smith Co., Inc.*, 20 Mass.App. 243, 479 N.E.2d 728, *further review granted*, 395 Mass. 1104, 482 N.E.2d 328 (1985). Conduct occurring prior to July 20, 1983, is, therefore, governed by former § 3 of chapter 93A.

*Hustler*'s February, 1983 issue was off the newsstands well before July, 1983. The claim under Chapter 93A with respect to the February, 1983 issue of *Hustler* is, therefore, subject to the provisions of former § 3(1)(b) of chapter 93A.

It is not disputed that Hustler received more than twenty percent of its gross revenues from interstate commerce outside the state of Massachusetts. It is also clear that the acts or transactions connected with Hustler's reproduction of "Cracking Eggs" did not occur primarily or substantially in Massachusetts.[7] The editorial work associated with "Bits and Pieces"

---

93A, § 11, pertaining to commercial disputes such as that at issue in this case, was not amended. A "loss of money or property" continues to be an element of the offense established by § 11 and, therefore, *Baldassari* remains controlling concerning this aspect of sustaining a § 11 cause of action.

**6.** Plaintiff argues that a loss to the value of his copyright would satisfy the requirements of § 11. The evidence established that no such loss occurred. Even if it had, the proposition advanced by plaintiff is doubtful. To the extent that plaintiff's interest in his copyright is protected by federal copyright law, any cause of action under state law is prempted. 17 U.S.C.

§ 301. Any damage to the value of the copyright would, on the facts of this case, arise from the infringement rather than from the alleged employment of an unfair or deceptive act or practices. There was no evidence that Hustler's publication had created any confusion as to Haberman's ownership of the copyright in "Cracking Eggs" and "The Feast." Plaintiff's own witness testified to the contrary.

**7.** The court in *Goldstein* adopted a place of conduct test rather than employing a transactional analysis. 20 Mass.App. at 249, 479 N.E.2d 728. Defendants' conduct in this case occurred in the state of California.

was done in California. The issue was printed in and shipped from Wisconsin. The magazine was distributed and sold nationwide. Accordingly, Hustler's activities with respect to the February, 1983 issue are exempt from the provisions of chapter 93A.

 Whether the former § 3(1)(b) exemption applies to the August, 1983 issue as well involves an additional consideration. The off-sale date for the August, 1983 issue was July 27, 1983. Evidence at trial indicated that the off-sale date is a firm date, within a week of which copies of a particular issue would no longer be available for sale. Thus, some copies of the August issue of the magazine are likely to have been available subsequent to the effective date of the repeal of former § 3(1)(b), July 20, 1983.

In the circumstances of this case, however, the adoption of a single publication rule—using the publication date rather than differing, later sales dates to determine the time at which allegedly illegal conduct occurred—is appropriate. *See Khaury v. Playboy Publications, Inc.,* 430 F.Supp. 1342, 1345 (S.D.N.Y.1977). Massachusetts has adopted a single publication rule in cases of libel. *Bigelow v. Sprague,* 140 Mass. 425, 5 N.E. 144 (1886); *see McGlue v. Weekly Publications, Inc.,* 63 F.Supp. 744 (D.Mass.1946). The considera-

tions favoring such a rule in cases of libel, including the problems of indefinite liability and difficulties arising in the computation of limitations periods, also favor use of a single publication rule for determining exposure to chapter 93A liability. The question presented by the repeal of § 3(1)(b) is analogous, in this respect, to those presented by statutes of limitation. The court concludes that the Massachusetts court would adopt a single publication rule to determine the availability of the interstate commerce exemption under 93A in the circumstances presented by this case.[8]

All of the acts necessary to plaintiff's cause of action were completed before repeal of former § 3. The on-sale date for the August, 1983 issue of *Hustler* magazine was June 28, 1983. Sales would have occurred within a week of that date. Publication, therefore, occurred well before repeal of former § 3 on July 20, 1983. Under these circumstances, Hustler's publication of "The Feast" in the August, 1983, issues of the magazine is exempt from the provisions of chapter 93A.

The court, therefore, concludes that plaintiff has not proven his claims under chapter 93A.

Judgment for the defendants on the claims of copyright infringement and the claims under Mass.Gen.Laws ch. 93A will enter in accordance with this opinion.

---

**8.** Such a rule is appropriate on the facts of the case. The activities for which *Hustler* was directly responsible were completed when copy for the August, 1983 issue was sent to the printer in Wisconsin, well before July 20, 1983. As a practical matter, *Hustler* could not have withdrawn its item on "The Feast" after May 25, 1983, when printing of it was completed. The entire issue was printed as of May 26, 1983, and shipments by FDC were completed by June 10, 1983.