Julia PENELOPE, f.k.a. Julia Penelope Stanley, Plaintiff,

v.

Rita Mae BROWN, American Artists, Inc., and Bantam Doubleday Dell Publishing Group, Inc., Defendants.

Civ. A. No. 90–40183–Y.

United States District Court, D. Massachusetts.

May 8, 1992.

Gerry A. Blodgett, Blodgett & Blodgett, Worcester, Mass., Mark A. Gallant, Goodhue & Goodhue, Topsfield, Mass., for plaintiff.

John Taylor Williams, Palmer & Dodge, Boston, Mass., for defendants.

## MEMORANDUM OF DECISION

YOUNG, District Judge.

This dispute between a scholarly English professor and a glitzy popular author in essence turns upon the richness and variety of the English language and the incredible heterogeneity of those who read and speak it. The English professor, Julia Penelope ("Penelope"), brought this copyright infringement action against three defendants: Rita Mae Brown ("Brown"), author of the allegedly infringing book, *Starting from Scratch: A Different Kind of Writers' Manual* (Bantam Books: hardcover ed., 1988; trade ed., 1989) ("*Starting from Scratch*");[1] American Artists, Inc., formerly known as Speakeasy Productions, Inc., the owner of the copyright to *Starting from Scratch;* and Bantam Doubleday Dell Publishing Group, the publisher of *Starting from Scratch*. Penelope seeks damages pursuant to 17 U.S.C. §§ 504(b) or (c) (1988) as well as injunctive relief restraining the defendants from publishing, licensing, distributing, or selling copies of *Starting from Scratch*.

For the reasons stated below, the Court grants the defendants' motion for summary judgment.

---

1. All page references to *Starting from Scratch* are to the trade edition.

## FACTUAL BACKGROUND

The following facts are undisputed. Penelope is an English professor and the author of *The Stylistics of Belief* (*"Stylistics"*).[2] *Stylistics* is included in an anthology entitled *Teaching About Doublespeak* (Daniel Deiterich ed., National Council of Teachers of English, 1976). *Stylistics* is a complex discussion of the use of syntax and diction to deceive and manipulate the reader. Penelope's discussion of syntax focuses on "syntactic constructions that permit or require deletion of the agent or experiencer of the predicate includ[ing] the passive, passive adjectives, nominalized passives, experience predicates (seem, appear), and attributive adjectives (appropriate, inappropriate, proper)." Penelope, *Stylistics, supra,* at 178. Penelope offers many examples of these syntactic constructions to illustrate how they can be used to manipulate the reader.

Brown is the author of popular fiction[3] and the writer's manual at issue here, *Starting from Scratch.* In *Starting from Scratch,* Brown offers a wide range of advice on how to follow in her footsteps and become a great writer. The allegedly infringing portion of Brown's 218 page book is contained in a five page section entitled "The Passive Voice, or the Secret Agent." Brown, *Starting from Scratch, supra,* at 72–76. That section explains the passive voice and its uses, and incorporates many of the examples used by Penelope in *Stylistics.* Brown apparently would not do well in Penelope's English classes, however, as Penelope claims that Brown incorrectly uses Penelope's examples as examples of passive voice when they are not, and were not intended by Penelope, to be examples of passive voice. In the original hardcover version of *Starting from Scratch,* Brown gave no credit to Penelope for these examples.

In response to a complaint by Penelope, the paperback version of *Starting from Scratch* acknowledges that examples used by Brown were taken from Penelope's work.

## DISCUSSION

### I. COPYING.

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* —— U.S. ——, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). The validity of the copyright covering *Stylistics* is not questioned. The question is whether Penelope has established that Brown copied original elements of Penelope's work.

■ Copying can be established either by presenting direct evidence of actual copying or by showing that the defendant had access to the copyrighted work and that there is substantial similarity between the copyrighted work and the allegedly infringing work. *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 606 (1st Cir.1988). Brown concedes that she had access to *Stylistics.* Brown Aff. ¶ 9. Examination of the two works

---

2. Penelope is also the author of "Syntactic Exploitation: Passive Adjectives in English," paper presented at the Southeastern Conference on Linguistics, Athens, Georgia, April 1972; "Passive Motivation," paper originally presented at the Southeastern Conference on Linguistics, Atlanta, Georgia, November 1971; "Nominalized Passives," paper originally presented at the Linguistics Society of America, Chapel Hill, North Carolina, July 1972; "The Stylistics of Appropriateness: A Redefinition," paper presented at the Conference on College Composition and Communication, New Orleans, April 1973; "What's in a Label: The Politics of Naming," paper presented at the South Central Modern Language Association, November 1974.

3. Brown is the author of *The Hand that Cradles the Rock* (New York University Press, 1971; Diana Press, 1974); *Songs to a Handsome Woman* (Diana Press, 1973); *Rubyfruit Jungle* (Daughters Pub. Co., 1973; Bantam Books, 1977); *In Her Day* (Daughters Pub. Co., 1976); *The Plain Brown Rapper* (Diana Press, 1976); *Six of One* (Harper & Row, 1978; Bantam Books, 1979); *Southern Discomfort* (Harper & Row, 1982; Bantam Books: paperback ed., 1983); *Sudden Death* (Bantam Books: hardcover ed., 1983; paperback ed., 1984); *High Hearts* (Bantam Books: hardcover ed., 1986; paperback ed., 1987); and *Bingo* (Bantam Books: hardcover ed., 1988; paperback ed., 1989).

reveals considerable similarity between them and favors a finding that Brown copied portions of *Stylistics.*

■ The materials claimed to have been copied fall into two general categories: explanations of different types of syntactic constructions, and examples illustrating those constructions. Penelope faces a higher burden when showing that Brown copied her explanations of linguistic principles. Copyright protects expression, not ideas. Where the ways of expressing an idea are few, the "burden of proof is heavy on the plaintiff who may have to show 'near identity' between the works at issue." *Concrete Mach.*, 843 F.2d at 606 (quoting *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1167 [9th Cir.1977]). Penelope has not met this burden.

■ There are few ways of explaining the syntactic constructions discussed in the works, constructions which, after all, are meant to comply with generally accepted rules of grammar. Brown did not copy Penelope's explanations verbatim. To show that Brown copied the explanations, Penelope points to the flaws in Brown's explanations suggesting that Brown did not understand the ideas and therefore could not create her own expression of them. Penelope suggests that Brown's lack of understanding forced her to copy Penelope's explanations and try to disguise her copying by making slight alterations. Even if Brown's explanations are flawed, this suggests only that Brown did not understand the concepts and does not indicate that she must have copied her explanations. It is a reasonable, if not, indeed, a compelling inference that Brown read *Stylistics* as well as other books and articles, struggled to grasp the concepts contained therein and then tried to express these common linguistic principles in a simpler way in her book. This is not copying.

Even so, a few of the examples Brown uses to illustrate the various linguistic concepts contained in her book are copied verbatim from *Stylistics.* Brown acknowledges in the paperback edition that she is indebted to Penelope for many of her illustrative examples. The only question is whether in copying these examples Brown was copying *original* elements of Penelope's work.

Brown argues that the examples at issue are statements that were made by third parties before the creation of *Stylistics* and therefore they cannot be the original expression of Penelope. It is true that statements made by third parties are not Penelope's original work and therefore are not entitled to copyright protection. "The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work. . . ." 17 U.S.C. § 103(b) (1988); *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 548, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985) ("copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original—for example, quotations borrowed under the rubric of fair use. . . .").

■ The selection and arrangement of preexisting material, however, is entitled to copyright protection. *Feist Publications, Inc.*, 111 S.Ct. at 1296 (matter is entitled to copyright protection if it was selected, coordinated, or arranged in an original way). Penelope selected these preexisting statements to express her ideas. Her selection necessarily required a two-fold analysis concerning whether the statements contained the desired grammatical construction and whether they furthered Penelope's point that such constructions can be used to manipulate the reader as well. *See* Penelope Aff. ¶¶ 10, 12. Penelope then arranged these carefully selected statements to best convey her message. Because Brown used the same examples to convey the same ideas, she can be said to have copied Penelope's original expression and this Court so rules.[4]

4. It is particularly ironic that this supposedly original author should have copied from an

English professor since she urges her readers "to cleanse your mind of what your English

## II. FAIR USE.

■ The fair use of a copyrighted work is not an infringement of copyright. 17 U.S.C. § 107 (1988). The factors to be considered in determining whether use of a work is fair use include:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* The above factors are not the only factors that should be considered, nor should any one of these factors be determinative. *Harper & Row,* 471 U.S. at 549, 105 S.Ct. at 2225. Rather, the four factors are intended merely to serve as general guidelines and should be considered in light of the purpose of the fair use doctrine: to prevent strict enforcement of the copyright law when its enforcement "would inhibit the very 'Progress of Science and useful Arts' that copyright is intended to promote." *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 477, 104 S.Ct. 774, 806, 78 L.Ed.2d 574 (1984) (Blackmun, J., dissenting).

■ To prevail on her motion for summary judgment, Brown must show that no dispute about material facts exists and that, upon this record, a reasonable trier of fact could reach but one conclusion: that Brown's use was fair within the meaning of 17 U.S.C. § 107. *Diamond v. Am–Law Pub. Corp.,* 745 F.2d 142, 147 (2d Cir. 1984).[5] As the following paragraphs reveal, application of the factors set forth in section 107 to the facts of the instant case leads inexorably to the conclusion that Brown's use of the examples in *Stylistics* was fair.

### A. Purpose and Character of the Use

Courts typically consider three factors when examining the purpose and character of an alleged infringer's use: whether the use was productive, whether the use was commercial, and whether the alleged infringer's conduct was proper. Examination of these factors reveals that the nature and character of Brown's copying suggest a finding of fair use.

The Supreme Court has held that a "productive use" of a copyrighted work, though not determinative, favors a finding of "fair use." *Harper & Row,* 471 U.S. at 561, 105 S.Ct. at 2231; *Sony Corp.,* 464 U.S. at 455 n. 40, 104 S.Ct. at 795 n. 40. A "productive use" is one that "result[s] in some added benefit to the public beyond that produced by the first author's work." *Id.* at 478, 104 S.Ct. at 807 (Blackmun, J., dissenting) (footnote omitted). This factor has also been phrased as whether the copied material was published to supersede the use of the original work. *Haberman v. Hustler Magazine, Inc.,* 626 F.Supp. 201, 210 (D.Mass.1986).

*Stylistics* is supplemented, not superseded, by *Starting from Scratch. Stylistics* is not superseded because it contains much more detail and covers more subjects than does Brown's section on passive voice. *Starting from Scratch* supplements *Stylistics* by trying to express some of the same material in a much simpler way so as to inform the average reader.

■ Penelope claims that Brown's use was not productive because Brown incorrectly used Penelope's examples to illustrate concepts which they do not exemplify. Even if Penelope's accusations are correct,

teachers told you." Brown, *Starting from Scratch, supra,* at 218.

5. Brown cites *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), for the proposition that Brown need only show the absence of evidence to support the non-moving party's case. Brown's reliance on *Celotex* is misplaced. *Celotex* involved a moving party who did not carry the burden of proof on the issue there central to the decision. Here, Brown carries the burden of proving the defense of fair use at trial. *Haberman v. Hustler Magazine, Inc.,* 626 F.Supp. 201, 208 (D.Mass.1986). Therefore, Brown must live up to a heightened standard on the issue of fair use at summary judgment.

they are irrelevant to determining whether Brown's use was productive. In creating the "productive use" test, the Supreme Court did not establish a threshold which may be surmounted only by a showing that the alleged infringers' use genuinely and substantially benefited the public. *See Harper & Row*, 471 U.S. at 561, 105 S.Ct. at 2231 (whether information was new to the public was irrelevant to determining whether it was news); *Haberman*, 626 F.Supp. at 210 (noting the dangers in the copyright context of evaluating the merit of a publication). Use that could have benefitted the public marginally is what is relevant, not use that in fact did benefit the public in some measurable way.[6]

Another factor to consider is whether Brown's use of Penelope's examples was commercial. The relevant question is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562, 105 S.Ct. at 2231. To be sure, Brown included portions of *Stylistics* in *Starting from Scratch* with the aim of strengthening the section of her book that deals with the passive voice. Only the examples set forth in a few scattered lines in the five page section on the passive voice, however, can be considered original work copied from Penelope in violation of the copyright law. The rest of that section, as discussed earlier, consists of explanations of ideas that can only be explained in a limited number of ways and therefore cannot be considered to have been copied. Brown's section on the passive voice, let alone her book as a whole, can hardly be said to depend for its vitality on these few examples copied from *Stylistics*. Thus, though Brown certainly stood to profit from her book, it is difficult to see how she stood to profit directly from the copied material.

▮▮ Penelope argues that the copied material is exploited to promote the sales of *Starting from Scratch*. Whether the inclusion of copied material was made evident to prospective purchasers has been held relevant when considering whether the alleged infringer profited from use of the copied material. *Haberman*, 626 F.Supp. at 211. Penelope claims the book jacket of the hardcover edition of *Starting from Scratch* promotes the section that contains the copied material. But the references to the section on the passive voice that appear on the bookjacket are merely references to the general explanations of passive voice that fall within that section of the book. None of Penelope's original material appears on the bookjacket. Brown did not exploit the copied material to promote sales of her book.

Another factor that should be considered when determining the character of Brown's use is the propriety of her conduct. *Harper & Row*, 471 U.S. at 562, 105 S.Ct. at 2231. *See, e.g., Marcus v. Rowley*, 695 F.2d 1171, 1175–76 (9th Cir.1983) (no attempt to secure permission or to credit plaintiff for use of the copyrighted work suggested improper conduct); *Radji v. Khakbaz*, 607 F.Supp. 1296, 1300–01 (D.D.C.1985) (defendants knew the material was copyrighted and that permission was required yet they did not try to get permission). While Brown is certainly chargeable with the knowledge that *Stylistics* was copyrighted material, it is arguable that she did not suspect that her minimal use of it triggered an obligation to seek Penelope's permission. In response to Penelope's complaint that she had not been acknowledged in the hardcover edition of Brown's book, Brown acknowledged Penelope in the paperback edition. Brown's actions do not constitute an "unjustified denial of [her] use of the plaintiff's work...." 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A], at 13–88.3 (1991).

### B. Nature of the Copyrighted Work

▮▮ "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row*, 471 U.S. at 563, 105 S.Ct. at 2232. *Stylistics* is a scholarly work the dissemi-

---

**6.** For a thoughtful explication of the implication of these concepts, see James L. Oakes, *Copy- rights and Copy-remedies: Unfair Use and Injunctions*, 18 Hofstra L.Rev. 983, 989–97 (1990).

nation of which would appear to benefit the public substantially, especially that portion of it—judges come to this writer's mind—who must deal with written "doublespeak" routinely.[7]

Although *Teaching About Doublespeak* is still in print and is sold in college bookstores, it cannot be said to be widely available to the public. Lack of availability lends Brown greater justification for reproducing it. 3 Nimmer, § 13.05[A] at 13–88.9.

### C. Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

Analysis under this factor requires a determination of both the quantitative and the qualitative substantiality of Brown's use of *Stylistics*. *Harper & Row*, 471 U.S. at 564–65, 105 S.Ct. at 2233. The copied portions of *Stylistics* are limited to a few sentences in the twelve page essay and do not constitute a quantitatively significant portion of that work. *See, e.g., New Era Publications Int'l, ApS v. Carol Publishing Group*, 904 F.2d 152, 158 (2d Cir.) (quotes of up to 8% of the copyrighted work allowed), *cert. denied*, —— U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990); *Marcus*, 695 F.2d at 1177 (quotes of 50% not allowed). Nor do the copied portions of *Stylistics* embody "the heart of" Pene-

lope's work. *Harper & Row*, 471 U.S. at 565, 105 S.Ct. at 2233.

### D. Effect on the Market

This factor has been held "the single most important element of fair use." *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233 (footnote omitted). The defendant's arguments rest primarily on the undisputed fact that *Teaching About Doublespeak* and *Starting from Scratch* would, even if promoted by bookstores at the same time, be displayed to the public in different sections on different shelves. Even if the two books were placed side by side, however, it strains credulity to conclude that a prospective purchaser of *Teaching About Doublespeak* would decide, after seeing *Starting from Scratch* on the shelf, to purchase *Starting from Scratch* instead. *Teaching About Doublespeak* is aimed primarily at educators and scholars and contains many serious detailed essays most of which focus on how to teach students to be alert for hidden messages in texts, especially in advertising. *Starting from Scratch* is aimed at novice writers of popular fiction and offers advice on sex, diet, and exercise, as well as writing style. *Starting from Scratch* cannot be said to have had an effect on the market for *Teaching About Doublespeak*.[8]

---

**7.** In her brief, Penelope confounds this issue with the issue of the nature and use of Brown's work. Penelope wrongly cites *Rubin v. Boston Magazine Co.*, 645 F.2d 80, 84 (1st Cir.1981) for the proposition that if an alleged infringer's use is for a commercial, rather than instructional, purpose, then the scholarly nature of the plaintiff's work is irrelevant. The nature of Brown's work does not change the fact that Penelope's work is scholarly and hence that the law should favor its dissemination. Even if the two factors should be considered in tandem, the fact that Brown hoped to make a profit does not eliminate the benefit to society of her efforts to create a more approachable presentation of the ideas contained in *Stylistics*.

**8.** Not only are the book covers strikingly different—designed to appeal to their separate markets—the substance and writing style is even more disparate. Consider, for example, how each of these authors ends her work.

I am advocating "linguistic consciousness-raising" for all of us, because we must begin with ourselves, whether it is in the classroom,

or in our personal relationships. In the classroom, there are many ways to increase the awareness of students, but perhaps the most effective way draws upon an aspect of our conditioning that we can use for self-improvement. That element of our lives is the need to compete. ("Need" is not the best word, but so it seems to us living in this culture.) Ultimately, I would hope that other ways might be found, but this one worked for a friend of mine. He assigned point values to the *circumstances* in which a student noticed sexism in language, and it would work equally as well for any of the other uses of language I've talked about. For example, if a student noticed sexism in the language of another student, in one of the textbooks, or in some outside source, she or he received one point toward her/his final grade in the course. If they noticed sexism in their own language, they received two points, and if they spotted sexism in the teacher's use of language, they got three points. In addition to this obvious system of rewards, one could have students

## CONCLUSION

This Court grants defendant's motion for summary judgment because Brown's use of *Stylistics* brought the analytic concepts concerning the passive voice to a larger public audience than would otherwise have been exposed to them, was fair use, and therefore did not infringe on Penelope's copyright.

keep notebooks of misuses of language that they hear or read, and set aside one day out of the week to discuss and analyze the examples that the students have collected. This method is illuminating and exciting, and many of my examples have come from my students' energetic researches. In composition courses, or in courses that require several papers, I've forbidden my students to use the passive in one paper, passive adjectives in another, and so on. Each use of the "forbidden" construction costs them ten points. A warning, however: At first, the protests of the students are vociferous, an indication of how much we lean on these constructions! When all the noise has died down, usually at the end of the course, many students have thanked me for helping them rid their written style of a reliance on vagueness and confusion. Doubtless, there are many, probably better, ways of raising one's linguistic consciousness in the classroom; I just don't know about them. But the classroom is the place where awareness has to start for most of us. As teachers, as human beings, we have to assume the responsibility for creating a language environment in which none of us is oppressed.

Penelope, *Stylistics, in Teaching About Doublespeak, supra,* at 186–87.

Another thing: Try to cleanse your mind of what your English teachers told you. They were reading with a different purpose from yours. They were also *confining themselves* to what has been generally accepted as high-quality literature. High quality, depending on where and when you went to school, can mean sterile and sanitized. Beware. You can't afford to think in terms of good and bad right now. You must think in terms of what works and what doesn't. Once you are secure about the mechanics of literature, you can apply yourself to the aesthetics of literature.

After this reading list, which is restricted to writers of English, I wish I could make one from all Western literature, but there just isn't room.

I wish we were gathered among other working writers to read together. Each person brings something unique to a work of literature and I will miss the discussions we aren't having. However, I do hope this helps you and that you'll stick with it over the years. Brown, *Starting From Scratch, supra,* at 218.