We agree with the district court that the Government's claim was not time-barred under § 6532(b). However, because the property in question was not "readily identifiable with" and necessary for the 1965 supply and service contract, we hold that Commonwealth was not entitled to the investment tax credit at issue.

**Affirmed in part, reversed in part.**

Sixto NÚÑEZ, Plaintiff, Appellant,

v.

CARIBBEAN INTERNATIONAL NEWS CORP. (El Vocero De Puerto Rico), Defendant, Appellee.

No. 99–2266.

United States Court of Appeals, First Circuit.

Heard Nov. 15, 2000.

Decided Dec. 21, 2000.

20

José Guillermo González, with whom José Manuel Urrutia–Vélez, was on brief, for appellant.

Juan R. Marchand–Quintero, with whom Francisco Ortiz–Santini and Juan R. Marchand–Quintero Law Offices, were on brief, for appellee.

Before TORRUELLA, Chief Judge, LYNCH, Circuit Judge, and GARCÍA–GREGORY,* District Judge.

TORRUELLA, Chief Judge.

This appeal raises the question whether the reproduction of independently newsworthy photographs without permission is a "fair use" pursuant to 17 U.S.C. § 107 when those photographs were acquired and reproduced in good faith and the work had already been distributed on a limited basis.

Because we find that such use is fair, we affirm the district court's grant of summary judgment.

* Of the District Court of Puerto Rico, sitting by    designation.

## BACKGROUND

Appellant Núñez, a professional photographer, took several photographs of Joyce Giraud (Miss Puerto Rico Universe 1997) for use in Giraud's modeling portfolio. Núñez then distributed the photographs to various members of the Puerto Rico modeling community in accordance with normal practice. After the photographs had been taken, some controversy arose over whether they were appropriate for a Miss Puerto Rico Universe, based on the fact that Giraud was naked or nearly naked in at least one of the photos. A local television program displayed the photographs on screen and asked random citizens whether they believed the photographs were "pornographic." Giraud was interviewed by two local television stations as to her fitness to retain the Miss Universe Puerto Rico crown. El Vocero then obtained several of the photographs through various means. Over the next week, without Núñez's permission, three of his photographs appeared in El Vocero, along with several articles about the controversy.

Núñez claimed that the reprint of his photographs in El Vocero without his permission violated the Copyright Act of 1976. The district court applied the fair use test of 17 U.S.C. § 107.[1] Focusing on the "newsworthy" nature of the photographs, the difficulty of presenting the story without the photographs, and the minimal effect on Núñez's photography business, the court concluded that El Vocero had met the requirements of § 107 and dismissed the complaint with prejudice.

1. In full, 17 U.S.C. § 107 provides:
    Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use, the factors to be considered shall include-
    (1) the purpose and character of the use, including whether such use is of a commer-

## DISCUSSION

### A. Standard of Review

■■■■ Fair use is a mixed question of law and fact. *Harper & Row, Publishers, Inc. v. The Nation Enters.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). When the district court, as here, has found sufficient facts to evaluate each of the statutory factors, we need not remand but may determine fair use as a matter of law. *Id.* Although the factors enumerated by Congress in § 107 are not meant to be exclusive, they are especially relevant to the overall fair use inquiry. *Id.* We thus examine each factor in turn. The ultimate determination of whether a use is fair requires a case-by-case analysis in which the four factors are to be "weighed together in light of the purposes of copyright." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

### B. The Purpose and Character of the Use

■■■■ The first factor in the fair use inquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The focus of this analysis asks "whether the new work merely 'supersedes the objects' of the original creation or instead adds something new." *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164 (quoting *Folsom v.*

cial nature or is for nonprofit educational purposes;
    (2) the nature of the copyrighted work;
    (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
    (4) the effect of the use upon the potential market for or value of the copyrighted work.
    The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all of the above factors.

*Marsh,* 9 F.Cas. 342, 348 (C.C.D.Mass. 1841)). The more "transformative" the new work, the less the significance of factors that weigh against fair use, such as use of a commercial nature. *Id.*

■ The district court found that appellee Caribbean both sought to "inform" and "gain commercially," and that the two purposes offset each other in the fair use analysis. For a commercial use to weigh heavily against a finding of fair use, it must involve more than simply publication in a profit-making venture.[2] *See id.* at 584, 114 S.Ct. 1164; *American Geophysical Union v. Texaco,* 60 F.3d 913, 921 (2d Cir.1994) (expressing wariness of emphasis on commercial use because most secondary users seek commercial gain). After all, activities such as news reporting (which is explicitly provided for in the preamble to § 107) "are generally conducted for profit in this country." *Campbell,* 510 U.S. at 584, 114 S.Ct. 1164 (quoting *Harper & Row,* 471 U.S. at 592, 105 S.Ct. 2218). We agree with the district court that the commercial use here, however, constitutes more than mere reproduction for a profitable use. The photographs were used in part to create an enticing lead page that would prompt readers to purchase the newspaper. Thus El Vocero used the photograph not only as an ordinary part of a profit-making venture, but with emphasis in an attempt to increase its revenue. *Cf. Haberman v. Hustler Magazine, Inc.,* 626 F.Supp. 201, 210 (D.Mass.1986) (pictures not displayed on magazine cover or advertising, but reproduced in regular feature section). For this reason, the commercial nature of the reproduction counsels against a finding of fair use.

However, the district court also found that the pictures were shown not just to titillate, but also to inform. Puerto Ricans were generally concerned about the quali-

fications of Giraud for Miss Puerto Rico Universe, as is demonstrated by the several television shows discussing the photographs. This informative function is confirmed by the newspaper's presentation of various news articles and interviews in conjunction with the reproduction. Appellee reprinted the pictures not just to entice the buying public, but to place its news articles in context; as the district court pointed out, "the pictures were the story." It would have been much more difficult to explain the controversy without reproducing the photographs. And although such an explanatory need does not always result in a fair use finding, *see Iowa State Univ. Research Found. v. American Broad. Cos., Inc.,* 621 F.2d 57, 60 n. 6 (2d Cir.1980), it weighs in the favor of appellee.

■ This is not to say that appellee's use of the photographs was necessarily fair merely because the photographs were used for news purposes, nor does it establish a general "newsworthiness" exception. First, the Supreme Court has specifically frowned upon such an exception. *See Harper & Row,* 471 U.S. at 561, 105 S.Ct. 2218 ("The fact that an article arguably is 'news' and therefore a productive use is simply one factor in a fair use analysis."). Second, the problem with such an approach (as the Supreme Court pointed out) is that it provides an incentive for the infringer to create "news," so that its infringement falls within the exception. *See id.* at 562, 105 S.Ct. 2218. Were a "newsworthy" use per se fair, journalists and news photographers would be left with little assurance of being rewarded for their work. *See id.* at 558, 105 S.Ct. 2218. It suffices to say here that El Vocero did not manufacture newsworthiness, as it sought not to "scoop" appellant by publishing his photograph, but merely to provide news reporting to a hungry public. And the fact that the story is admittedly on the tawdry

---

**2.** Before the Supreme Court's decision in *Campbell,* several courts had suggested that any commercial use was presumptively unfair. *See Campbell,* 510 U.S. at 572, 577–78, 114 S.Ct. 1164. As the Court noted, however, to follow such a presumption would contradict the examples of fair use provided for in the preamble to § 107. *Id.* at 584, 114 S.Ct. 1164.

side of the news ledger does not make it any less of a fair use. *See id.* at 561, 105 S.Ct. 2218 ("Courts should be chary of deciding what is and what is not news.").

Rather, what is important here is that plaintiffs' photographs were originally intended to appear in modeling portfolios, not in the newspaper; the former use, not the latter, motivated the creation of the work. Thus, by using the photographs in conjunction with editorial commentary, El Vocero did not merely "supersede[ ] the objects of the original creation[s]," but instead used the works for "a further purpose," giving them a new "meaning, or message." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164. It is this transformation of the works into news—and not the mere newsworthiness of the works themselves—that weighs in favor of fair use under the first factor of § 107. *See id.* ("central inquiry is whether defendant's use is transformative"); *see also Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 478, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (Blackmun, J., dissenting) (key question is whether defendant's use "result[s] in some added benefit to the public beyond that produced by the first author's work").

■■■ Appellee's good faith also weighs in its favor on this prong of the fair use test. *See Harper & Row,* 471 U.S. at 562–63, 105 S.Ct. 2218; *Haberman,* 626 F.Supp. at 211. First, El Vocero attributed the photographs to Núñez. Although acknowledgment does not excuse infringement, the failure to acknowledge counts against the infringer. *See Narell v. Freeman,* 872 F.2d 907, 914 (9th Cir.1989). Second, El Vocero obtained each of the photographs lawfully. An unlawful acquisition of the copyrighted work generally weighs against a finding of fair use; no such theft occurred here. *See Haberman,* 626 F.Supp. at 211. Third, as the district court explicitly found, El Vocero did not aim to use the photographs to compete with Núñez, nor to supplement his right of first production, as the photographs had already been distributed to the modeling

community. *See id.* at 212. Finally, appellee asserts that it believed in good faith that the photographs were available for general, unrestricted circulation and redistribution, and appellant offers little evidence to rebut this assertion.

In sum, the highlighting of the photograph on the front cover of El Vocero exposes the commercial aspect of the infringing use, and counts against the appellee. However, the informative nature of the use, appellee's good faith, and the fact that it would have been difficult to report the news without reprinting the photograph suggest that on the whole, this factor is either neutral or favors a finding of fair use.

## C. Nature of the Copyrighted Work

■■ The second factor focuses on "nature of the copyrighted work." 17 U.S.C. § 107(2). Courts have generally considered two aspects of the work in evaluating this factor: first, the extent to which it is a creative work enjoying broader copyright protection as opposed to a factual work requiring broader dissemination, *see Harper & Row,* 471 U.S. at 563–64, 105 S.Ct. 2218, and second, whether it is unpublished, in which case the right of first publication is implicated, *see id.* at 564, 105 S.Ct. 2218.

The district court suggested, and we agree, that Núñez's pictures could be categorized as either factual or creative: certainly, photography is an art form that requires a significant amount of skill; however, the photographs were not artistic representations designed primarily to express Núñez's ideas, emotions, or feelings, but instead a publicity attempt to highlight Giraud's abilities as a potential model. *Cf. Haberman,* 626 F.Supp. at 211 (reproduction of surrealistic art in magazine, where creativity counted against fair use finding). Given the difficulty of characterizing the "nature" of the photographs, we find that the impact of their creativity on the fair use finding is neutral.

**24**

This reproduction, however, does not threaten Núñez's right of first publication. Although these photographs had not before been published in a book or public portfolio, they were hardly confidential or secret, as was the manuscript in *Harper & Row* prior to its serial publication. Giraud had commissioned the pictures for the very purpose of semi-public dissemination. Moreover, their release had created a scandal, and the photographs had already been shown on the evening news by the time of their publication in El Vocero. Finally, Núñez had not sought to control further dissemination during his limited distribution: he had not registered the copyright prior to publication in El Vocero, required recipients to sign non-disclosure or no-resale agreements, or even sought oral promises from recipients not to redistribute the photographs.

In sum, this factor favors appellee.

### D. Amount and Substantiality of the Use

The third factor is the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). However, such an inquiry must be a flexible one, rather than a simple determination of the percentage used. *See Campbell*, 510 U.S. at 588–89, 114 S.Ct. 1164 (acknowledging that for a parody to be effective, it had to take enough material to evoke the original); *Harper & Row*, 471 U.S. at 565–67, 105 S.Ct. 2218 (emphasizing the importance rather than the amount of material copied). The "inquiry must focus upon whether 'the extent of . . . copying' is consistent with or more than necessary to further 'the purpose and character of the use.'" *Castle Rock*, 150 F.3d at 144 (quoting *Campbell*, 510 U.S. at 586–87, 114 S.Ct. 1164). In this case, El Vocero admittedly copied the entire picture; however, to copy any less than that would have made the picture useless to the story. As a result, like the district court, we count this factor as of little consequence to our analysis.

*Cf. Amsinck v. Columbia Pictures Indus., Inc.*, 862 F.Supp. 1044, 1050 (S.D.N.Y. 1994) (fact that entire mobile included in film did not hurt defendants).

### E. Effect on the Market

The fourth statutory factor requires us to consider "the effect of the use upon the potential market for or value of the · copyrighted work." 17 U.S.C. § 107(4). The district court, when assessing this factor, examined "whether [Núñez's] business as a photographer could be hurt," rather than "the market for the pictures," and concluded that no evidence of damage to Núñez's overall business had been adduced. We cannot agree with this approach. The statute explicitly points to the "potential market for or value *of the copyrighted work.*" 17 U.S.C. § 107(4) (emphasis added). This statutory language suggests that we should limit our analysis to the effect of the copying on the market for the reproduced photographs. The overall impact to Núñez's business is irrelevant to a finding of fair use. *See Harper & Row*, 471 U.S. at 568, 105 S.Ct. 2218. In fact, to the extent that the copying damages a work's marketability by parodying it or criticizing it, the fair use finding is unaffected. *See Campbell*, 510 U.S. at 590, 114 S.Ct. 1164. In short, this factor is "concerned with secondary uses that, by offering a substitute for the original, usurp a market that properly belongs to the copyright holder." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir.1998).

Our inquiry, therefore, is restrained to: (i) "the extent of market harm caused by the particular actions of the alleged infringer"; and (ii) "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market." *Id.* In other words, we examine the effect of *this* publication on the market, and we also determine whether wide-scale reproduction of professional photographs in news-

papers (for similar purposes) would in general affect the market for such photography. As to the first, we find little impact on the market for these specific pictures. The district court noted that the purpose of dissemination of the pictures in question is not to make money, but to publicize; they are distributed for free to the professional modeling community rather than sold for a profit.[3] The fact that a relatively poor reproduction was displayed on the cover of a newspaper should not change the demand for the portfolio. If anything, it might increase it. *Cf. Amsinck*, 862 F.Supp. at 1049 (noting possible increase in demand after reproduction); *Haberman*, 626 F.Supp. at 212–14 (same). The analysis is comparable in the abstract: even if there was widespread conduct of this sort, it would have little effect on the demand for disseminated pictures because a newspaper front page is simply an inadequate substitute for an 8″ × 10″ glossy.

However, the potential market for the photographs might also include the sale to newspapers for just this purpose: illustrating controversy. It is true that El Vocero's use of the photograph without permission essentially destroys this market. There is no evidence, however, that such a market ever existed in this case. Núñez does not suggest that he ever tried to sell portfolio photographs to newspapers, or even that he had the right to do so under the contract with Giraud. *See Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 81 (2d Cir.1997). Although it is more likely that other photographers do engage in such sales, and thus that widespread conduct of the type committed by El Vocero could destroy the newspaper sale market as a whole, we note again the context of this case. Surely the market for professional photographs of models publishable only due to the controversy of the photograph itself is small or nonexistent. *See Infinity*, 150 F.3d at 111 (the market must be "likely to be developed");

*Ringgold*, 126 F.3d at 81 (avoiding the problem of circularity in this factor by considering only "traditional, reasonable, or likely to be developed" markets).

Although our analysis of the effect of this reproduction on the market is slightly different than that conducted by the district court, we reach the same result. Because the only discernible effect of the publication in El Vocero was to increase demand for the photograph, and because any potential market for resale directly to the newspaper was unlikely to be developed, this factor favors a finding of fair use.

## CONCLUSION

In sum, the first, second, and fourth factors generally favor a finding of fair use. The third factor does not seem particularly relevant in this context. Again, we note that the finding of fair use always entails a case-by-case analysis, *see Campbell*, 510 U.S. at 578, 114 S.Ct. 1164, and the present case is no exception. Unauthorized reproduction of professional photographs by newspapers will generally violate the Copyright Act of 1976; in this context, however, where the photograph itself is particularly newsworthy, the newspaper acquired it in good faith, and the photograph had already been disseminated, a fair use exists under 17 U.S.C. § 107. As a result, we **affirm** the decision of the district court.

---

3. Although photographs such as these are generally commissioned directly by the model or the model's agent, and paid for according-

ly, these particular photographs were taken as a favor to Giraud's agent.