**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-2163
_____

PETER MURPHY,
                    Appellant,

v.

MILLENNIUM RADIO GROUP LLC; CRAIG CARTON;
RAY ROSSI

_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 08-cv-1743)
District Judge: Honorable Joel A. Pisano
_____

Argued January 25, 2011

Before: FUENTES and CHAGARES, *Circuit Judges*; POLLAK, *District Judge**


(Opinion Filed: June 14, 2011)

Maurice Harmon (argued)
Harmon & Seidman, LLC
The Pennsville School
533 Walnut Drive
Northampton, PA  18067

    *Attorney for Appellant*

David S. Korzenik (argued)
Miller Korzenik Sommers LLP
488 Madison Ave.
New York, NY 10022

Thomas J. Cafferty (argued)
Gibbons P.C.
One Gateway Center
Newark, NJ  07102-5310

    *Attorneys for Appellee*

---

* The Honorable Louis H. Pollak, Senior District Judge for the United States District Court  for the Eastern District of Pennsylvania, sitting by designation.

---

OPINION OF THE COURT

---

Fuentes, *Circuit Judge*:

Peter Murphy ("Murphy") has filed an appeal from the decision of the District Court granting summary judgment to Millennium Radio Group, Craig Carton, and Ray Rossi (the "Station Defendants") on Murphy's claims for violation of the Digital Millennium Copyright Act ("DMCA"), copyright infringement, and defamation under state law. For the reasons given below, we reverse on all counts.

**I.**
**Background**

In 2006, Murphy was hired by the magazine *New Jersey Monthly* ("*NJM*") to take a photo of Craig Carton and Ray Rossi, who at the time were the hosts of a show on the New Jersey radio station WKXW, which is owned by Millennium Radio Group. *NJM* used the photo to illustrate an article in its "Best of New Jersey" issue naming Carton and Rossi "best shock jocks" in the state. The photo ("the Image") depicted Carton and Rossi standing, apparently nude, behind a WKXW sign. Murphy retained the copyright to the Image.

An unknown employee of WKXW then scanned in the Image from *NJM* and posted the resulting electronic copy to the WKXW website and to another website, myspacetv.com.

3

The resulting image, as scanned and posted to the Internet, cut off part of the original *NJM* caption referring to the "Best of New Jersey" award. It also eliminated *NJM*'s gutter credit (that is, a credit placed in the inner margin, or "gutter," of a magazine page, ordinarily printed in a smaller type and running perpendicular to the relevant image on the page) identifying Murphy as the author of the Image. The WKXW website invited visitors to alter the Image using photo-manipulation software and submit the resulting versions to WKXW. A number of visitors eventually submitted their versions of the photo to WKXW, and it posted 26 of those submissions to its site. The Station Defendants never received Murphy's permission to make use of the Image.

When Murphy discovered the Image on the WKXW website, he communicated, via his attorney, with WKXW, demanding that the alleged infringement cease. Shortly thereafter, Carton and Rossi made Murphy the subject of one of their shows, allegedly stating that one should not do business with him because he would sue his business partners. They also allegedly implied that Murphy, who identifies himself as a married heterosexual and the natural father of children, was a homosexual.

In April 2008, Murphy sued the Station Defendants for violations of § 1202 of the Digital Millennium Copyright Act of 1998 ("DMCA"), copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and defamation under New Jersey law. Murphy then served various discovery requests upon the Station Defendants, including deposition requests for Carton and Rossi and a corporate representative of Millennium Radio Group. At the behest of both Murphy and the Station Defendants, a number of delays in the

4

discovery process followed. The magistrate judge held a conference with the parties after the end of the discovery period designated in the original case-management schedule, at which point only limited discovery had actually taken place. At that conference, the judge set a June 2009 deadline for the Station Defendants to file a motion to dismiss for failure to state a claim with respect to both the defamation and the DMCA claims.[1]

In May 2009, Murphy served additional discovery requests on the Station Defendants, who, in response, requested a stay of discovery while the motion to dismiss was pending. The magistrate judge granted this stay.

The Station Defendants then filed a motion for summary judgment on *all* claims. In response, Murphy filed a motion pursuant to Fed. R. Civ. P. 56(f) (now Fed. R. Civ. P. 56(d)), with accompanying affidavit, requesting additional discovery before the resolution of any summary judgment motions.

In March 2010, the District Court denied Murphy's motion pursuant to Fed. R. Civ. P. 56(f) and granted the Station Defendants' motion for summary judgment on all

---

[1] Murphy describes this in the current briefing as a motion to dismiss. Some of the papers suggest that it was scheduled as a motion for summary judgment. The difference is inconsequential for our purposes.

counts.  Murphy now appeals the grant of summary judgment on all counts.[2]

## II.
## Discussion

### A. DMCA claim

Murphy argues that, by reproducing the Image on the two websites without the *NJM* credit identifying him as the author, the Station Defendants violated the Digital Millennium Copyright Act.  The DMCA was passed in 1998 to address the perceived need of copyright owners for "legal sanctions" to enforce various technological measures they had adopted to prevent the unauthorized reproduction of their works.  *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 458 (2007).  It also served "to conform United States copyright law to its obligations under two World Intellectual Property Organization ('WIPO') treaties, which require contracting parties to provide effective legal remedies against the circumvention of protective technological measures used by copyright owners."  *MDY Indus. v. Blizzard Entm't, Inc.*, 629 F.3d 928, 942 (9th Cir. 2010).

---

[2] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  We have jurisdiction under 28 U.S.C. § 1291.  Our review of the District Court's grant of summary judgment is plenary, which means that we will affirm only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *Noel v. Boeing Co.*, 622 F.3d 266, 270 n.4 (3d Cir. 2010).

The most well-known provision of the DMCA, § 1201, grants a cause of action to copyright owners for the "circumvent[ion of] a technological measure that effectively controls access to a work." 17 U.S.C. § 1201(a)(1)(A).[3] Thus, for example, if a movie studio encrypts a DVD so that it cannot be copied without special software or hardware, and an individual uses his own software to "crack" the encryption and make copies without permission, the studio may pursue the copier both for simple infringement under the Copyright

---

[3] Section 1201 provides:

> (a) Violations regarding circumvention of technological measures.—
>
> (1)(A) No person shall circumvent a technological measure that effectively controls access to a work protected under this title...
>
> (3) As used in this subsection--
>
> (A) to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and
>
> (B) a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

Act and, separately, for his circumvention of the encryption, which is a "technological measure" designed to "control . . . access to" the DVD, under the DMCA. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 444 (2d Cir. 2001). Before the passage of the DMCA, the studio would have had only a cause of action under the Copyright Act. The DMCA has been criticized in some circles for its "potentially overbroad scope . . . and its ability to chill legitimate and, in some cases, constitutionally protected speech." G. Parchomovsky & P. Weiser, *Beyond Fair Use*, 96 Cornell Law Review 91, 104 (2010).[4]

Murphy's claim against the Station defendants involves § 1202 of the DMCA, which deals with "copyright management information" ("CMI"). Section 1202(b) provides in part:

> No person shall, without the authority of the copyright owner or the law—
>
> **(1)** intentionally remove or alter any copyright management information, [or]
>
> [...]

---

[4] Some courts have held, for instance, that the DMCA substantially narrows the protection offered by the "fair use" affirmative defense to copyright infringement by permitting plaintiffs to bring causes of action for circumvention even when they cannot bring causes of action for infringement. *See MDY Indus. v. Blizzard Entm't, Inc.* 629 F.3d 928, 950-52 (9th Cir. 2010); *contra Chamberlain Group, Inc. v. Skylink Techs. Inc.,* 381 F.3d 1178, 1203 (Fed. Cir. 2004).

**(3)** distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

Section 1202(c) then defines "copyright management information" as certain types of "information conveyed in connection with copies . . . of a work . . ., including in digital form, . . . : (2) [t]he name of, and other identifying information about, the author of a work . . . ."[5]

Murphy's argument is straightforward. He contends that the *NJM* gutter credit identifying him as the author of the Image is CMI because it is "the name of . . . the author of [the Image]" and was "conveyed in connection with copies of [the Image]." By posting the Image on the two websites without the credit, therefore, the Station Defendants "remove[d] or alter[ed]" CMI and "distribute[d]" a work knowing that its CMI had been "removed or altered" in violation of § 1202.[6]

---

[5] Only the type of information identified in subsection (2) is at issue in this case.

[6] Because the District Court rejected Murphy's argument on this point, it did not consider whether summary judgment was appropriate on the other elements of a § 1202 claim, such as whether the Station Defendants acted knowing that the removal would induce or enable infringement. Thus,

9

The Station Defendants, on the other hand, insist that one cannot read § 1202 in isolation, but must interpret it in conjunction with § 1201 and in light of the legislative history of the DMCA to impose an additional limitation on the definition of CMI. They argue that the chapter as a whole protects various kinds of automated systems which protect and manage copyrights. Specifically, § 1201 covers the systems (the "technological measures" discussed above) that *protect* copyrighted materials and § 1202 covers the systems that *manage* copyrighted materials (such as the name of the author of a work). Therefore, they conclude, despite the apparently plain language of § 1202, information like the name of the author of a work is not CMI unless it also functions as part of an "automated copyright protection or management system." In other words, to remove, as the Station Defendants did, a printed credit from a magazine photograph which was then posted to a website does not violate § 1202, because the credit, although apparently meeting the definition of § 1202(c)(2), was not part of an "automated copyright protection or management system." They claim that both the legislative history of the DMCA and the language of the World Intellectual Property Organization treaties which the DMCA implemented support such a reading. Viewed thus, the Station Defendants argue, § 1202 will be seen not to apply to Murphy's name as it appeared in the gutter credit near the Image.

We are not aware of any other federal appellate courts which have considered whether the definition of "copyright

---

although the Station Defendants attempt to raise that issue now, we take no position on it at this time.

10

management information" should be restricted to the context of "automated copyright protection or management systems."[7] We begin, as we must, with the text of § 1202. "Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute . . . . When the statute's language is plain, the sole function of the courts—at least where the disposition required by the test is not absurd—is to enforce it according to its terms." *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009) (citations, quotations marks, and parentheticals omitted). The exception to this rule is narrowly cast. "Generally, where the text of a statute is unambiguous, the statute should be enforced as written and only the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 314 (3d Cir. 2010) (internal quotation marks and citation omitted).

There is nothing particularly difficult about the text of § 1202. Even the Station Defendants, and the courts whose decisions they cite, do not contend that § 1202 is, in itself,

---

[7] The district courts which have considered the question to date have reached different conclusions. Some have indeed adopted the Station Defendants' reading of § 1202. *See, e.g., IQ Group v. Wiesner Pub., LLC*, 409 F. Supp. 2d 587 (D.N.J. 2006); *Textile Secrets Int'l, Inc. v. Ya-Ya Brand, Inc.*, 524 F. Supp. 2d. 1184, 1198 (C.D. Cal. 2007). A number of others, however, have rejected it. *See, e.g., Agence France Presse v. Morel*, --- F. Supp. 2d ---, 2011 WL 147718, at *9 (S.D.N.Y. Jan. 14, 2011).

ambiguous or unclear. Read in isolation, § 1202 simply establishes a cause of action for the removal of (among other things) the name of the author of a work when it has been "conveyed in connection with copies of" the work. The statute imposes no explicit requirement that such information be part of an "automated copyright protection or management system," as the Station Defendants claim. In fact, it appears to be extremely broad, with no restrictions on the context in which such information must be used in order to qualify as CMI. If there is a difficulty here, it is a problem of policy, not of logic. Such an interpretation might well provide an additional cause of action under the DMCA in many circumstances in which only an action for copyright infringement could have been brought previously. Whether or not this result is desirable, it is not *absurd*, as might compel us to make a more restrictive reading of § 1202's scope.[8]

---

[8] The Station Defendants argue that this interpretation would cause the DMCA to "swallow up" the Copyright Act, effectively making the latter redundant. In fact, if an infringer merely copies an entire work whole—as in the example above of a pirated film on DVD—Section 1202 will probably not be implicated, as the infringer will not have removed or altered any CMI. The Station Defendants point out that most fair uses will involve the removal of CMI. However, unlike § 1201, § 1202 applies only when a defendant knows or has reasonable grounds to know that the removal will "induce, enable, facilitate, or conceal" an infringement. Thus, those intending to make fair use of a copyrighted work are unlikely to be liable under § 1202.

The Station Defendants argue that to read § 1202 by itself is to take too narrow a view of the "plain language" of the statutory text. When interpreting statutory language, we must examine the statute as a whole, rather than considering provisions in isolation. *Samantar v. Yousuf*, --- U.S. ---, 130 S. Ct. 2278, 2289 (2010). However, nothing in § 1201, the provision regarding circumvention of "technological measures" discussed above to which the Station Defendants point most insistently, restricts the meaning of CMI in § 1202 to information contained in "automated copyright protection or management systems." Section 1201 does not mention "copyright management information"; in fact, it does not refer to § 1202 at all. Neither does it contain the phrase "automated copyright protection or management systems."[9] Similarly, § 1202 does not refer to § 1201, and the definition of CMI is located squarely in § 1202.

If, in fact, § 1201 and § 1202 were meant to have such interrelated interpretations, it is peculiar that there is no explicit indication of this in the text of either provision. Instead, to all appearances, § 1201 and § 1202 establish independent causes of action which arise from different conduct on the part of defendants, albeit with similar civil remedies and criminal penalties. It may strike some as more intellectually harmonious to interpret the prohibition of removal of CMI in § 1202 as restricted to the context of § 1201, but nothing in the text of § 1201 actually dictates that it

---

[9] The Station Defendants do not argue that "technological measures," as defined in § 1201, are the same as "automated copyright protection or management systems."

13

should be taken to limit the meaning of "copyright management information."[10]

As for the purpose of the statute as a whole, it is undisputed that the DMCA was intended to expand—in some cases, as discussed above, significantly—the rights of copyright owners. The parties here differ only as to their conclusions regarding the *extent* to which the DMCA expanded those rights. Murphy's definition of CMI provides for a significantly broader cause of action than the Station Defendants' does. However, the Station Defendants can point to nothing in the statute as a whole which compels the adoption of their reading instead of Murphy's. In short, considering the purpose of the statute does not provide us with meaningful guidance in this case.

As discussed above, therefore, in accordance with *In re Philadelphia Newspapers*, we must look to the legislative history of the DMCA only for that "extraordinary showing of contrary intentions" which would justify rejecting a straightforward reading of § 1202. 599 F.3d at 314 (holding that a narrow exception to the plain meaning rule applies in the "rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of

---

[10] The Station Defendants point out that the title of the chapter to which § 1201 and § 1202 belong is "Copyright Protection and Management Systems." However, "[i]t is a well-settled rule of statutory interpretation that titles and section headings cannot limit the plain meaning of statutory text where that text is clear." *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of the City of Newark*, 344 F.3d 335, 348 (3d Cir. 2003).

its drafters" (*citing United States v. Ron Pair Enters. Inc.*, 489 U.S. 235, 242 (1989))).  The Station Defendants rely on the survey of the legislative history undertaken by the courts in *IQ Group v. Wiesner Pub., LLC*, 409 F. Supp. 2d 587 (D.N.J. 2006) and *Textile Secrets Int'l, Inc. v. Ya-Ya Brand, Inc.*, 524 F. Supp. 2d. 1184, 1198 (C.D. Cal. 2007).  The *IQ Group* decision placed most emphasis on a "white paper" of the working group of the Information Infrastructure Task Force (IITF), the organization that produced the first draft of §§ 1201 and 1202.  This white paper reported that

> A combination of file- and system-based access controls using encryption technologies, digital signatures and steganography are . . . employed by owners of works to address copyright management concerns. . . . To implement these rights management functions, information will likely be included in digital versions of a work (i.e., *copyright management information*) to inform the user about the authorship and ownership of a work . . . .

409 F. Supp. 2d at 594 (emphasis added).  Thus, the *IQ Group* court concluded, the paper "understood 'copyright management information' to be information . . . that is included in digital versions of the work so as to implement 'rights management functions' of 'rights management systems.'"  *Id.* at 595.  And, as the text of § 1202 was not altered before its adoption by Congress, the court found that this gave a clear indication of Congressional intent.  *Id.* at 594-95.  Additionally, the Senate Committee Report to § 1202 describes CMI as including "such items as the title of the work, the author . . . CMI need not be in digital form, but CMI in digital form is expressly included."  *Id.* at 596.

15

The *Textile Secrets* court also looked to the World Intellectual Property Organization treaties that the DMCA was intended to implement. The WIPO treaties use a term "rights management information" and define it as "information which identifies the work, the author of the work . . . when any of these items of information is attached to a copy of a work or appears in connection with the communication of a work to the public." *See, e.g.,* WIPO Copyright Treaty Art. 12 (adopted Dec. 20, 1996), *available at* http://www.wipo.int/treaties/en/ip/wct/trtdocs_wo033.html#P 89_12682. They require that parties to the treaties provide adequate remedies against the "remov[al] or alter[ation of] any *electronic* rights management information without authority." *Id.* (emphasis added) The *Textile Secrets* court concluded that "electronic rights management information" as used in the WIPO treaties and "copyright management information" as used in § 1202 must be coterminous in meaning. 524 F. Supp. 2d at 1198. Therefore, it found, "copyright management information" must be electronic. *Id.*

While this analysis has some force, in the end, the strongest case which the Station Defendants can make is that the legislative history of the DMCA is *consistent* with its interpretation, not that it actually *contradicts* the reading advocated by Murphy. The IITF white paper describes CMI as "information [that] will likely be included in digital versions of a work . . . to inform the user about the authorship and ownership of a work." *IQ Group*, 409 F. Supp. 2d at 594. This description leaves the question of just how that information will be included—that is, whether it *must* be used in some form of "an automated copyright protection or

16

management system" or whether it can be conveyed by other means—entirely open.

Similarly, the WIPO treaties' definition of "electronic rights management information" is "information [that] will likely be included in digital versions of a work . . . to inform the user about the authorship and ownership of a work."[11] Although this definition occurs in the context of a broader discussion of systems that control access to copyrighted works, it does not *require* that "electronic rights management information" be embedded in such systems.[12] In addition, neither the WIPO treaties nor the DMCA indicate the precise relationship between the concepts of CMI and "electronic rights management information" as discussed in the treaties. The Station Defendants argue that their meanings must be identical, but Congress was certainly free, in implementing the WIPO treaties, to define "copyright management information" more broadly than "electronic rights management information."[13]

---

[11] The Station Defendants agree with Murphy that, whatever CMI is, it is not necessary for it to be "digital." For example, they concede that a bar code printed in ink on a paper label might be CMI.

[12] Again, the Station Defendants do not argue that CMI must be presented in "electronic" form, only that it function in connection with an electronic (or automated; the Station Defendants treat the terms as interchangeable, though they are not) copyright protection or management system.

[13] There is even a textual argument that Congress did so. The DMCA's definition of "copyright management information" uses language very similar to that of the WIPO treaties'

17

definition of "rights management information" (without a reference to a medium or format). *Compare*

> information conveyed in connection with copies . . . of a work . . ., including in digital form, . . . : (2) [t]he name of, and other identifying information about, the author of a work . . .

17 U.S.C. § 1202(c) (the DMCA's definition of "copyright management information" with respect to author-identifying information) *with*

> information which identifies the . . . author of the work . . . when [this] information is attached to a copy of a work or appears in connection with the communication of a work . . .

WIPO Copyright Treaty Art. 12(2) (the WIPO treaties' definition of "rights management information" for the same).

The WIPO treaties then go on (as the DMCA does not) to impose certain requirements concerning only *electronic* rights management information, which implies that "rights management information" might well exist in other forms. It might therefore be argued that the DMCA's definition of "copyright management information" tracks the more expansive WIPO definition of "rights management information," rather than WIPO's narrower (if still not clearly defined) "*electronic* rights management information." If so, then arguments about whether the WIPO treaties intended to require *electronic* rights management information to function as part of "an automated copyright protection or management system" are irrelevant.

Thus, while it is possible to read the legislative history to support the Station Defendants' interpretation of CMI, that history does not provide the "extraordinary showing of contrary intentions" which would compel us to disregard the plain language of the statute. This is especially so because the Station Defendants are essentially asking us to rewrite § 1202 to insert a term—that is, "automated copyright protection or management system"—which appears nowhere in the text of the DMCA and which lacks a clear definition. We would need compelling justification indeed to adopt such a statutorily-unmoored interpretation.

Therefore, we find that CMI, as defined in § 1202(c), is *not* restricted to the context of "automated copyright protection or management systems." Rather, a cause of action under § 1202 of the DMCA potentially lies whenever the types of information listed in § 1202(c)(1)-(8) and "conveyed in connection with copies . . . of a work . . . including in digital form" is falsified or removed, regardless of the form in which that information is conveyed. In this case, the mere fact that Murphy's name appeared in a printed gutter credit near the Image rather than as data in an "automated copyright protection or management system" does not prevent it from qualifying as CMI or remove it from the protection of § 1202.[14]

### B. Copyright infringement claim

---

[14] The Station Defendants also raise the issue of whether they "removed" the CMI. The District Court did not address this issue, and we need not do so at this stage of the litigation.

Murphy also argues that the reproduction of the Image on the two websites without his consent infringed his copyright in the Image.[15] The Station Defendants, in response, assert the affirmative defense of fair use.

The doctrine of fair use places important limitations on a copyright owner's right to control the use of its work, so that the statute does not "stifle the very creativity which that law is designed to foster" by preventing further uses of the work which enrich our culture and do not significantly diminish the value of the original. *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 197 (3d Cir. 2003) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)). As codified in 17 U.S.C. § 107, the factors governing whether a particular use of copyrighted material is "fair" are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

---

[15] Although Murphy challenged the use of both the original Image and the photomanipulated images submitted by WKXW fans on the website in the District Court, he has appealed the finding of fair use with respect to the use of the original Image only.

20

(4) the effect of the use upon the potential market for or value of the copyrighted work.

These four factors may not "be treated in isolation, one from another.  All are to be explored, and the results weighed together, in light of the purposes of copyright."  *Campbell,* 510 U.S. at 578.  However, the analysis of the District Court in this case relied most heavily on the first and fourth factors.

### 1.  *Purpose and character of the use*

The District Court found that the first factor favored the Station Defendants, because their use of the Image was "transformative."  When courts evaluate the first factor,

> [t]he central purpose of th[e] investigation is to see . . . whether the new work merely supersedes the objects of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks . . . whether and to what extent the new work is transformative.

*Campbell*, 510 U.S. at 578-79 (internal quotation marks, alterations, and citations omitted).  The Station Defendants assert, and the District Court found, that the Station Defendants' use of the *unaltered* Image was transformative in this sense.  This conclusion is not persuasive.  The Image was originally created to illustrate a *NJM* article informing the public about Carton and Rossi's "best of" award; the Station Defendants themselves state they "used [the Image] . . . to report to their viewers the newsworthy fact of [Carton and Rossi's] receipt of the magazine's award."  (App't Br. 40)

21

Although they claim that the difference is significant, there is, in fact, no meaningful distinction between the purpose and character of *NJM*'s use of the Image and the Station Defendants' use on the WKXW website.

The Station Defendants argue further that because the purpose of their use was "news reporting," and news reporting appears in the Copyright Act's nonexhaustive list of potential purposes of fair use, Murphy's claim must necessarily fail. Under many circumstances, reporters will indeed be able to claim a fair use defense against claims of infringement. For instance, had the Image itself become controversial due to its "salacious" content, it would likely have been fair use for a newspaper to reproduce it to accompany an article about the controversy. However, news reporting does not enjoy a blanket exemption from copyright. News organizations are not free to use any and all copyrighted works without the permission of the creator simply because they wish to report on the same events a work depicts. "The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the [work]." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 557 (1985) (finding verbatim republication of key portions of Gerald Ford's memoirs not to be fair use).

Instead, news reporting must satisfy the same test as other supposedly transformative works. The Station Defendants' use of the Image does not do so. *Campbell* has made it clear that the "heart" of a claim for transformative use is "the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." 510 U.S. at 580. However, if "the

22

commentary has no critical bearing on the substance or style of the original . . . which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness . . . diminishes accordingly (if it does not vanish) . . . ." *Id.* The First Circuit's decision in *Nunez v. Caribbean Int'l News Corp.,* 235 F.3d 18 (1st Cir. 2000), provides an excellent example of when the use of a photograph for news purposes qualifies as a fair use. In *Nunez*, a professional photographer took several risqué photographs of Joyce Giraud for use in Giraud's modeling portfolio. *Id.* at 21. After the photographs were taken, Giraud won the Miss Puerto Rico Universe competition, and a controversy arose over whether the photographs were inappropriate for a Miss Puerto Rico Universe. *Id.* A newspaper then published three of the photographs, along with several articles about the controversy, prompting the photographer to sue for copyright infringement and the newspaper to assert the fair use defense. *Id.* In analyzing whether the newspaper's publication of the photographs was transformative, the First Circuit noted that the photographs serve an "informative function . . . confirmed by the newspaper's presentation of various news articles and interviews in conjunction with the reproduction." *Id.* at 22. By "using the photographs in conjunction with editorial commentary, [the newspaper] did not merely 'supersede[ ] the objects of the original creation[s],' but instead used the works for 'a further purpose,' giving them a new 'meaning, or message.'" *Id.* at 23 (quoting *Campbell,* 510 U.S. at 579).

By contrast, no similar broader news coverage or editorial commentary existed in this case, as the Station Defendants simply posted Murphy's photograph on their website. The absence of any broader commentary—whether

23

explicit or implicit—significantly undercuts the Station Defendants' argument that their use gave any new meaning to the Image. Instead, it appears that the Station Defendants did not want to go to the trouble of creating their own eye-catching photo of Carton and Rossi to illustrate their announcement of the *NJM* award, but simply appropriated the Image for the same purpose. This is far from transformative. And, in the absence of transformativity, other considerations, "like the extent of [the use's] commerciality," become more important in determining which party the first factor favors. *Id*.

In general, "commercialism . . .weigh[s] against a finding of fair use." *Id*. at 579. The Station Defendants have not contested that their use is commercial. Therefore, as the use of the image was not transformative and was commercial, the first factor, the purpose and character of the use of the image, weighs against the Station Defendants.

### 2. *Impact on the market for the original*

The District Court's finding that the fourth factor—the impact on the market for the original—also favors the Station Defendants was also erroneous. The District Court held that Murphy had not established that he had experienced any market harm simply by asserting that he would have been willing to license the Image if WKXW had approached him. It is true that a copyright owner cannot claim market harm simply because he would have liked to charge for the use in question. If that were the case, then it would be difficult indeed for any fair use defense to succeed.

24

"The fourth fair use factor . . . requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (internal quotation marks and citations omitted). When a copyright owner "clearly does have an interest in exploiting a licensing market—and especially where the copyright holder has actually succeeded in doing so—'it is appropriate that potential licensing revenues . . . be considered in a fair use analysis.'" *Princeton Univ. Press v. Mich. Document Servs.,* 99 F.3d 1381, 1387 (6th Cir. 1996) (quoting *Am. Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 930 (2d Cir. 1994)). In determining whether such a licensing market exists, we look to "the impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 614 (2d Cir. 2006).

Murphy is a professional photographer who engages in licensing of his work. If it were possible to reproduce his unaltered work, as a whole, without compensation under the guise of news reportage—a "traditional, reasonable, or likely to be developed market[]" for professional photographers—it would surely have a "substantially adverse impact" on his ability to license his photographs. As the Supreme Court has noted, "when a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes [the original] . . . and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Id.* at 591 (internal quotation marks and citations omitted). Such is the case here.

Finally, the Station Defendants suggest that there is no market for the Image because Carton and Rossi no longer work as a team and because the importance of the *NJM* award was fleeting in any event. However, they cite no precedent for the proposition that a copyright owner must prove substantial demand for the work in question in order to establish infringement.[16] Clearly, at the time the Image was posted on the WKXW website, there was at least one party who thought the use of the Image had some value—the Millennium Radio Group. That there may not have been much other demand for it hardly means that the Station Defendants were entitled to use it for free. Further, without discovery into the relevant markets, such statements are pure speculation on the part of the Station Defendants.[17]

### 3. *Nature of the work and amount copied*

Although the court spent little time on the second and third factors of the fair use analysis, it should be noted that they favor Murphy as well. The second factor is the "nature of the work," with more "creative expression" entitled to more protection than "factual works." *See Campbell*, 510

---

[16] Obviously, however, the extent of demand for the work may affect the calculation of damages.

[17] As "fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell*, 510 U.S. at 590. The Station Defendants fault Murphy for not providing more evidence about the market for his work, but this misplaces the evidentiary burden.

U.S. at 586-87.  The Image is more creative expression than factual work.  *See, e.g., Southco., Inc. v. Kanebridge Corp.*, 390 F.3d 276, 284 (3d Cir. 2004).  The third factor is the amount of the work copied.  *Campbell*, 510 U.S. at 586.  The Station Defendants copied the Image in its entirety.  Thus, both factors weigh in favor of Murphy.

In finding in favor of the Station Defendants, the District Court relied heavily on *Campbell*'s relative discounting of the weight of the second and third factors in the context of parody.  However, *Campbell* explicitly treated parody as "a difficult case," because "[w]hen parody takes aim at a particular original work, the parody must be able to 'conjure up' . . . the original . . . ."  510 U.S. at 588.  Thus, copying is not only helpful, but often *necessary*, in creating a parody, and even extensive copying of creative expression may be fair use in genres which rely for their artistic effect, at least in part, on the evocation of the original.  The Station Defendants do not assert that their use of the *unaltered* Image was a parody.  At the very least, the court has not explained how the use by the Station Defendants is of such a nature as to require analysis similar to that of parody.

Thus, all four factors here favor Murphy and the District Court erred in finding that the Station Defendants' reproduction of the *unaltered* Image on the WKXW website was a fair use.[18]

---

[18] Murphy complains that the District Court did not engage in an independent analysis of the posting of the unaltered photograph on myspacetv.com.  It does not appear, however—at least from the *present* record—that the analysis

27

## C.    Discovery and the defamation claim

As mentioned above, when the Station Defendants sought summary judgment on Murphy's defamation claim, he filed a motion pursuant to Fed. R. Civ. P. 56(f) (now 56(d)). Such a motion is, of course, the proper recourse of a party faced with a motion for summary judgment who believes that additional discovery is necessary before he can adequately respond to that motion. *Doe v. Abington Friends School*, 480 F.3d 252, 257 (3d Cir. 2007). "District courts usually grant properly filed Rule 56(f) motions as a matter of course. This is particularly so when there are discovery requests outstanding or relevant facts are under the control of the moving party." *Id.* (internal quotation marks and citations omitted). The standard of appellate review is abuse of discretion. *Renchenski v. Williams*, 622 F.3d 315, 339 (3d Cir. 2010).

A claim of defamation under New Jersey law generally requires an analysis closely grounded in the facts of the individual case. "As a general rule, a statement is defamatory if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him." *Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152, 164-65 (1999). "In determining whether the statements are defamatory, we must consider the content, verifiability, and context of the challenged statements." *Ward v. Zelikovsky*, 136 N.J. 516, 529 (1994).

---

should be any different from the analysis for the posting on the WKXW website.

In this case, Murphy has been able to obtain only limited information about the fundamental basis of his claim, that is, the actual statements Carton and Rossi made on air about him. The Station Defendants destroyed their recording of the show shortly after airing, and no transcript has been produced. In such circumstances, in order for Murphy to make out his claim, it would obviously be essential for him to depose the people who made the statements in the first place, that is, Carton and Rossi. Yet, despite his timely attempts to schedule them for depositions, he was unable to do so before the District Court granted summary judgment against him.

The Station Defendants have spent little time rebutting the specific arguments offered by Murphy as to why the information he sought was relevant to the resolution of their summary judgment motion. Instead, they argue that Murphy could not have been harmed in any way by the foreclosure of discovery because, for the purposes of resolving that motion, the District Court accepted as true all allegations made in the complaint. This argument is peculiar, as it implies that, in effect, Murphy was obligated to plead in his complaint not merely sufficient facts to state his claim for the purposes of Fed. R. Civ. P. 12(b), but also to survive summary judgment. The Station Defendants cite no precedent for this approach, and we are aware of none.

Unfortunately, the District Court offered essentially no analysis in its order denying Murphy's 56(f) motion, leaving it unclear what, if any, additional analytic basis its denial may have had. Under these circumstances, and given that Murphy's arguments respecting the importance of the information he sought are plausible, it would not be

appropriate to defer to the District Court's determination on this point. Therefore, with respect to the defamation claims, the District Court's decision is vacated and remanded to permit Murphy to conduct adequate discovery.[19]

## III.
## Conclusion

For the foregoing reasons, we will vacate the District Court's grant of summary judgment in the Station Defendants' favor on all counts.

---

[19] We therefore do not reach the other issues raised on appeal, such as whether an allegation of homosexuality is susceptible of a defamatory meaning under New Jersey law.